[Civ. No. 3097. Fourth Dist. Feb. 9, 1944.]

HELEN TULLER, as Administratrix, etc., Respondent, v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY (a Corporation) et al., Appellants.

Jonathan C. Gibson, Leo E. Sievert, H. K. Lockwood and Chester O. Hansen for Appellants.

Hildebrand & Bills and Edmond A. Chevalier for Respondent.

BARNARD, P. J.—This is an action for damages on account of the death of Claude P. Tuller, an employee of the defendant railroad company, who was killed in a collision between a switch engine and a truck and semi-trailer owned by the defendant transfer company and driven by the defendant Freitas. The collision occurred at 11:50 o'clock a. m. on November 26, 1941, on premises owned by the Sun Maid Raisin Growers Association. A jury returned a verdict for $35,000 against all defendants. Motions for a new trial were denied and a judgment was entered from which the railroad company and the other defendants have separately appealed.

The accident occurred on the easterly of two parallel railway tracks extending through the Sun Maid property. It was stipulated that the tracks were also owned by Sun Maid. To the east of these tracks there was a row of sheds all filled with raisin boxes except for one, near the center, which was left open and used as a driveway. While there was no graded roadway the surrounding ground was level, had an oiled surface and was about flush with the top of the railway tracks. For some years trucks had been driven through this shed, which was No. 69, across the railway tracks and on through the Sun Maid grounds. The easterly rail of the tracks was about 16½ feet westerly from the row of sheds. It was cus-

tomary for switch engines to pass along these tracks and do daily switching for this industry.

On the occasion in question a switch engine was proceeding north on the easterly of these tracks for the purpose of bringing out certain cars. The switch engine was traveling backward and three men were standing on the footboard at the forward end of the moving engine. Engine foreman Stephens was standing on the westerly portion of the footboard, switchman Ridgeway was standing on the easterly portion and the deceased, Tuller, was standing near the center of the footboard. As the engine neared shed No. 69 the truck and semi-trailer, driven by Freitas, came out of that shed and proceeded across the railway tracks, moving toward the west. The truck and semi-trailer was about 40 feet long and as it was proceeding across the nearest railway track it was struck by the backing switch engine at a point near the center or slightly to the rear of the center of the semi-trailer. The engine foreman and the switchman jumped and escaped injury, but Tuller was crushed between the engine and the semi-trailer and received injuries which caused his death.

Freitas testified that he had been driving similar equipment through this shed for many years; that he came out from shed 69 at a speed of about five miles an hour; that at that speed he could stop in less than 5 feet; that he could not look to the south along the railroad tracks until he emerged from the shed; that his seat was about 9 feet behind the front bumper of the truck; that as he came out of the shed he looked to the right first because it was an open view; that he then looked to the south; that when he looked to the south he saw the switch engine coming about 60 feet away; that he thought the engine was going to stop; that he proceeded at about the same speed for about 40 feet; that he did not apply the brakes until "pretty near to the impact"; that he saw some men on the footboard of the engine; that two of them got off the footboard; and that he did not see any signals given. He also testified that for a good many years he had known that switching was done over these tracks; that he knew such switching was done after 12 o'clock but had not seen it before 12 o'clock; and that he had not known exactly what time it was when he crossed this track, although someone told him afterward it was 11:50 a. m.

A disinterested witness, who was in the best position to see the accident, testified that when the truck and semi-trailer

emerged from shed 69 the switch engine was about 35 feet from the point of impact. At another time he testified that the distance the switch engine traveled during this interval was 50 feet. He also testified that the locomotive was moving about 7 or 8 miles an hour; that it did not slow down prior to the impact; that when the engine was about 20 feet from the point of impact he saw the man on the west side of the footboard give a signal by moving his arm up and down; that he gave this signal more than once; that the engineer did not seem to heed this signal; and that the engine did not slacken its speed. The engine foreman, who gave this signal, testified that he first saw the truck when he was about 20 feet from the point of impact; that he then gave this signal to stop to the engineer; that after giving this signal he reached around and opened an angle-cock which opens the airline and sets the brake; that he then heard the air-brake take effect and jumped off; and that he was standing five feet from the point of impact when it was all over. At another time he testified that the engine traveled between 30 and 35 feet between the time he first saw the truck and the time of the impact; that he did not see the truck until Ridgeway yelled at him; that this was when they were 30 or 35 feet away and he then gave the signal and later turned on the air; and that there had been times previously when his signals had not been seen by this engineer.

Ridgeway, the switchman, testified that he saw the truck and semi-trailer as it came out of the shed; that he was approximately 30 feet away when he saw the front of the truck; that he "just hollered and jumped off" and gave the fireman the stop sign. The fireman testified that he saw the truck as it was coming out of shed 69, that the locomotive was then 15 feet from the truck, that he then called to the engineer to put on the emergency, and that he saw Ridgeway jump from the footboard but did not remember that he gave him any signal. The engineer testified that he first saw the truck when it "started to go out the left side, the west side"; that he had the signal from the foreman and had the brake on before he saw the truck, and that the engine was traveling five miles an hour. While he testified that he did not know in how many feet the engine could be stopped while traveling at that speed he admitted that he had testified at the coroner's inquest that at a speed of

five miles an hour the engine could be stopped in approximately 6½ feet. He then explained, in effect, that it would take some additional time to get the signal and to act upon it, and that the 6½ feet applied after you got an effective brake.

■ The appellant railroad company's only contention is that the accident was caused by the negligence of the truck driver and that the evidence is not sufficient to establish negligence on its part. It is argued that the accident happened on private property and not at a public crossing; that it was engaged in ordinary switching movements; that the speed of the switch engine was reasonable; that its employees were on the alert; that the engine foreman had never before seen any traffic coming out of shed 69; that he had never been informed that this area was used as a roadway; that the engine was within 20 feet of the point of impact before its employees saw the truck coming out of the shed; that the engine foreman immediately gave a stop signal to the engineer and then himself opened the angle-cock to turn on the air brakes; that the engineer acted promptly upon receiving the signal to stop; and that there is no evidence in the record which indicates that the switch engine could have been brought to a stop in time to avoid the accident.

On the other hand, there is evidence that the engine was farther away at the time the truck emerged from the shed, the distance being variously estimated at from 30 to 60 feet. The engine foreman at one time gave the distance as 35 feet and the disinterested witness at one time gave it as 50 feet. The fact that the application of the air brakes was not heard until the engine was about five feet from the point of impact, and the further fact that the engine did not slow down until about the time of the impact indicate that an unnecessary interval elapsed between the time the truck could have been seen, according to a part of the evidence, and the time the brakes were actually applied. The evidence not only justifies the inference that the engine could have been stopped sooner than it was, but also justifies the inference that this appellant's employees, or some of them, were not as alert as they should have been. The evidence was conflicting and, under the circumstances, the question of negligence on the part of this appellant was one of fact for the jury and the evidence sustains its finding in that regard.

█ The only point raised by the other appellants is that the court committed prejudicial error in giving, at the request of the appellant railroad company, an instruction reading as follows:

"You are instructed that a railway track is of itself a warning. It is a place of danger. It can never be assumed that cars or trains are not approaching on a railroad track or that there is no danger therefrom. It is therefore the duty of every person who approached a railroad track to exercise proper vigilance to ascertain and to know whether any trains or cars are approaching thereon before attempting to cross thereover. Proper vigilance requires every such person to look and listen before going upon said tracks or so close thereto as to be in danger; and if, for any reason the view to any extent is obstructed, the person or persons, endeavoring to cross said track or going so close thereto as to be in danger either of their person or property, should exercise a degree of precaution which ordinary prudence would dictate in such an exigency; that is, in stopping and listening or even getting out of the vehicle in which they may be riding and going ahead in order to overcome the obstruction to vision, if necessary. The looking, listening and stopping thus required should be exercised at the last moment which ordinary prudence would dictate before passing from a place of safety to one of danger. *If the ability to look or listen be obstructed by natural or artificial objects then the duty to stop before entering into a zone of danger, in order that proper investigation may be made, becomes absolute.*" (Italics ours.)

It is argued that the court thus, in effect, instructed the jury that there was an absolute duty on the part of the appellant Freitas to stop, look and listen before entering upon this spur track, that the instruction failed to distinguish between the absolute duty of stopping which might exist at a public grade crossing and the degree of care required before entering upon a spur track on private property, that it ignored other circumstances which here appear, and that it told the jury that Freitas was negligent because he did not stop on this occasion.

The part of this instruction complained of is the last sentence, which we have italicized. The instruction as a whole was intended as a general statement of the usual

rules relating to the duty resting on one about to cross a railroad track. We agree with these appellants that the last sentence thereof should not have been given in this form. But it does not follow that it was sufficiently prejudicial to justify a reversal, in view of the other instructions which were given.

In a number of other instructions, the court told the jury that the duty of such a person to stop is not an absolute one; that this duty is one depending upon the particular conditions obtaining at the time; that the driver of a motor vehicle is not required under all circumstances to stop before crossing a railroad track; that it is not negligence *per se* not to stop, look and listen; and that "there is no absolute requirement that the operator of a motor vehicle must actually stop before crossing a railroad track, the question as to whether he should stop, as well as look and listen, being ordinarily a question of fact to be left to you for your determination." The court then specifically instructed the jury as follows:

"You are instructed that though circumstances may appear in the evidence from which the duty may be cast upon a driver of a motor vehicle, as a man of ordinary prudence, in the exercise of ordinary care, to stop before attempting to cross a railroad track, yet there is no such rule of law applicable to all circumstances; and it is for you to say from the facts of this particular case whether defendant Joseph Leo Freitas should have stopped, either before he commenced to cross the railroad tracks, or before he crossed the particular track upon which the accident occurred."

The court not only fully and completely instructed the jury that there was not an absolute duty to stop under the circumstances of this case but the jury was so informed at the outset of the trial. In his opening statement counsel for the railroad company stated that the driver of the truck in question "did not stop, look and listen, as required to do by law, before he crossed that railroad track." Counsel for these appellants objected to that remark as not being a correct statement of the law and asked the court to instruct the jury that the duty to stop was not an absolute one. In response to this request the court told the jury "You will disregard that part of the statement which states that the driver of the truck must stop, look and listen, as a matter

of law; and you will disregard that in the consideration of the case.''

The court also instructed the jury that it was not to single out any one sentence or any one instruction, but that it should consider the instructions altogether and as a whole. While the criticized portion of the instruction should not have been given, it cannot be held that reversible error resulted therefrom in the situation here appearing.

For the reasons given the judgment, as affecting all appellants, is affirmed.

Marks, J., and Griffin, J., concurred.

A petition for a rehearing was denied March 6, 1944, and appellants' petition for a hearing by the Supreme Court was denied April 6, 1944.