**SWEETING et al. v. PENNSYLVANIA R. CO.**

**No. 8376.**

Circuit Court of Appeals, Third Circuit.

Argued Dec. 21, 1943.

Decided May 1, 1944.

B. Nathaniel Richter, of Philadelphia, Pa., for appellant.

Philip Price, of Philadelphia, Pa. (Scott Seddon and Barnes, Dechert, Price & Smith, all of Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, GOODRICH, and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

This is a death action under the Federal Employers' Liability Act, § 1 et seq., U.S. C.A. Title 45, § 51 et seq. In the District Court there was a direction of verdict in favor of the defendant on the grounds that the accident was attributable to the negligence of plaintiff's decedent and that there was no negligence on the part of the defendant. From the judgment so entered the plaintiff takes this appeal. The trial court in directing the verdict said:

"So, looking at this evidence in its most reasonable light, and most favorable to the plaintiff as to any subsidiary evidence from which inferences may be drawn, the inference is,—and the evidence all points to the same effect,—that it happened by reason of the fact that this intestate in some way touched the energized portion which he should not have done, and therefore followed none of the rules and regulations or methods which common sense would dictate in the matter, is negligence. The accident, whether it was negligence or through slipping or some other way, that he came in contact with the energized portion was attributable to his own negligence, for which no one was to blame, and for which there was no negligence on the part of the defendant company."

The decedent was a hostler. He worked for the defendant in its South Philadelphia engine house, moving engines from one location to another, within that particular area. He was qualified for his particular job. He was fifty-nine years old and had been employed by the railroad for forty-one years. He was married, with one child; a girl seven years old. He did not drink and had a very happy home life.

There is no question regarding interstate commerce involved.

About 2:30 P.M., July 4, 1942, he was sent by his foreman to the inspection pit to bring an electric locomotive to the engine house. Sweeting went from right outside the round house office, where he had received his instructions, to the pit—a distance of "about two blocks." At 2:37 P. M. a power outage was noted as occurring within Sub Arsenal 2A, which included the vicinity of the pit. As later events showed, this indicated the initial contact of Sweeting with the electric current. The current was restored without any investigation and at 2:40 P.M., another outage occurred. A report of·this was received at the engine house and an investigation requested. The two men, sent out, went directly to the inspection pit. They found Sweeting lying on the ground alongside the particular locomotive, which had not been moved from the pit. The clothing on the upper part of his body was in flames. He was removed to a hospital. He had both electric contact and flame burns. He died July 10, 1942 as a result of the flame burns. Within forty minutes of the accident, Sweeting told his attending doctor, in response to the question, "How did this happen?":

"'* * * I was on the electric engine pumping—' Then he used a word I don't remember— Then he said 'he had come in contact with 11,000 volts."

That testimony was offered as part of the res gestae and admitted over objection. The question whether it could also have been admitted as part of the patient's medical history, told the treating physician, was not raised at the trial.

When Sweeting arrived at the engine, the ordinary procedure would have been to mount it and go inside the cab. In order to make contact with the overhead wires, the electric engine in question had two pantagraphs on its roof. This is usual electric locomotive equipment with the pantagraph being the modern electric engine equivalent of the old fashioned trolley pole. The pantagraphs, when not in use, are folded down on the roof of the engine and automatically held in place by mechanical latches. To raise them, the latches are released and they ascend by spring pressure. The ordinary ways of releasing the latches are: (a) Pressing the "up" button within the cab to the "in" position. If there is thirty-five pounds or more air pressure as indicated by a gauge, the latch handle is re-leased; (b) when the reservoir air pressure is insufficient, a small hand pump, also within the cab, is used to develop sufficient air pressure to release the latch; (c) in case of necessity, there is a specially insulated pole, with a hook on the end of it, for pulling the latches. This pole should be handled with rubber gloves which are in a case within the cab. These are the only methods permitted by the company's rules. Ordinarily, a pantagraph should be fully raised and against the wire or folded down on top of the engine with the automatic latch holding it in place. It is conceded that immediately after the accident, No. 1 pantagraph was only half way up.

Once Sweeting was inside the cab, the next customary step would be to ascertain if there was sufficient air as indicated by the gauge. Assuming everything normal and enough pressure, simply pushing the "up" button would release the pantagraph latches with the pantagraphs rising to the overhead wires. If the gauge showed less than thirty-five pounds, then the hand pump should be used. To do these things, Sweeting, of necessity, had to be within the cab. They not only were the only proper things, but the easiest. Contact of one of the pantagraphs with the overhead wire completed the circuit between the wire and the locomotive but there was a rule of the yard that both pantagraphs had to be raised when a locomotive was operated. The only other permitted method of raising the pantagraphs, as stated, was to use the special pole. Other than these methods, a person could physically climb to the roof of the engine, release one latch manually and while that pantagraph was ascending, proceed along the engine roof and, if he were lucky, perhaps be able to unlatch the second pantagraph before the first had established the electric circuit.

■ Sweeting must be presumed to have been actually engaged in the performance of his duties and exercising due care for his own safety, Tennant, Adm'x, etc., v. Peoria & Pekin Union Railway Co., 321 U.S. 29, 64 S.Ct. 409. His instant duties, as stated, consisted in mounting the engine, going inside the cab, ascertaining the condition of the air pressure reservoir as shown by the gauge, operating the push button if enough air; and if insufficient pressure, using the hand pump. If adequate air pressure could not be obtained, his further duties were to open the glove case, put on the gloves, dismount from the cab, obtain the pole and

manipulate it to unlatch the pantagraphs. After the accident the gauge showed ample air pressure; the pump was in order; the gloves were undisturbed in their case; and the pole was in place.

Both pantagraphs were unlatched after the accident with nothing wrong with the latch mechanisms; No. 2 was fully extended and No. 1 half way. It is possible, of course, that Sweeting, arriving at the engine, could have deliberately risked his life by climbing up the outside of it on to the roof and endeavoring to raise the pantagraphs manually. He had to get both up and once one of them met the overhead wire, the pantagraph region was electrically charged and he could not avoid being shocked if he then attempted to handle the second pantagraph. Such strange tactics are unexplainable when compared with the usual method of simply entering the cab and pushing a button. Another possible reason for his going to the roof could be that if after he had worked the button inside the cab he then discovered that No. 1 pantagraph had not fully ascended. In that event, he could have left the cab, passing by the gloves in the glove case, passing by the specially treated pole on the outside of the engine, mounted the latter and tried to raise the then live No. 1 pantagraph with his bare hands. Under the admitted facts, all of this would have had to have been accomplished within the seven minutes which elapsed from when Sweeting's foreman ordered him to the engine and the first outage; during which period he had walked the two blocks distance to the inspection pit. Sweeting himself was the only eye witness to the accident. He said that he was on the electric engine pumping, when he was shocked with 11,000 volts of electricity. The only place he could pump was inside the cab.

■ From the probabilities, the time element, the presumption that he was properly attending to his job with due care for his own safety, and Sweeting's own testimony, it could be inferred that he was within the locomotive cab when he was electrically shocked.

■ It is true that the general rule in this type of case is that the burden of proof rests on the plaintiff to show that injury resulted from negligence on the part of the defendant. However, here, if the accident happened inside the cab, then the very nature of the accident of itself and through the presumption it carries, supplies the requisite proof. If Sweeting was shocked within the cab, such accident, ordinarily speaking, would not have happened if those having the control of the locomotive and of the cab, used proper care and warrants the inference of negligence; in other words, res ipsa loquitur. Mr. Justice Pitney in Sweeney v. Erving, 228 U.S. 233, at page 240, 33 S.Ct. 416, at page 418, 57 L.Ed. 815, Ann.Cas.1914D, 905, regarding this latter phrase says:

"In our opinion, res ipsa loquitur means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict. Res ipsa loquitur, where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is whether the preponderance is with the plaintiff."

Lukon v. Pennsylvania R. Co., 3 Cir., 131 F.2d 327, was a death case under the Federal Employers' Liability Act. A section hand was killed while walking on railroad tracks. There was testimony that a train passed him going fast, that coal in tender of the locomotive was not trimmed, that the deceased was not injured before a train passed him and that after a train passed him he was found with a fractured skull and large lumps of coal around his head. The court recognized that the mere fact of injury was insufficient to enable the plaintiff to recover under the Act and that the burden was on the plaintiff to prove the defendant was negligent. The court, through Judge Biggs, said at page 329 of 131 F.2d:

"The circumstances of the case at bar bring it within the doctrine of res ipsa loquitur."

And at page 330 of 131 F.2d:

"From this evidence the jury could find, as it did, that the accident was caused by coal falling from one of defendant's passing trains. The jury drew the inference of the defendant's negligence from the fact of the accident plus the common knowledge that coal does not fall from trains if tenders or cars are properly loaded or trimmed. It was, of course, for the jury to decide also what, if any, of the explanatory testimony

offered by the defendant was to be credited."

\*    \*    \*    \*    \*    \*

"We think the evidence was sufficient for the jury to find that the accident was caused by defendant's negligence."

Defendant strongly urges that because of the construction of the electrical apparatus on and in the locomotive, the decedent could not have received an electrical shock if he had been within the cab. Defendant's expert witnesses might well be able to persuade a jury that it was impossible for Sweeting to have been electrically shocked inside of the cab and so explain away or rebut the inference rising from the way the occurrence might be construed to have happened but in submitting the question to a jury we do not see that this necessarily involves a misconception of either the electrical appurtenances of the locomotive or of the principles of electricity itself.

The appellee further contends that certain marks on the top of the locomotive, one of them being on the tip of the handle of the No. 1 pantagraph, were made as the result of contact with the deceased and show him to have been on top of the engine. It also suggests that where Sweeting was found after the accident, he being alongside the engine under the half raised pantagraph, substantiates this. Plaintiff, on the other hand, argues that, since the decedent had no broken bones or serious injury and was found lying face down; with his death occurring seven days after the accident from the flame burns, the probabilities are that he had instinctively left the inside of the cab where he could obtain no possible help and was able to make his way to the ground where he was found.

With reference to such testimony, the United States Supreme Court in the Tennant case, supra, 321 U.S. 29, 64 S.Ct. at page 412, says:

"It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable."

As intimated, we think that whether Sweeting was in the engine cab when he was electrically shocked is a jury question. If a jury should decide that he was, then its further course with reference to the particular point of res ipsa loquitur would be as indicated by the Supreme Court's language in the Sweeney v. Erving opinion, supra.

■ The other question in this matter also concerns evidence. The proofs affirmatively demonstrate that the electric current was restored without investigating the cause of the outage and that once restored, a second outage occurred. There is testimony to the effect that the second shock to the decedent directly affected his condition. Witnesses for the defendant said restoration of the current was uniform electric railroad practice; although one stated that there were exceptions to such general rule. There was evidence that, to some extent at least, the reason why the first outage was not checked was that the power director was busy on the telephone. It is the fact that the current was not restored a second time and that an investigation immediately followed the repetition of the outage. The outage was thought to be within a comparatively limited section and the South Philadelphia round house, the scene of the trouble, was the only place where inquiry was made. The investigating employees went directly to the inspection pit and there found Sweeting. Forceful argument is made that investigation of every power outage would make orderly operation of the railroad impossible. That may be true and a jury might draw such conclusion. We do think, however, that the evidence on this phase of the case also presented a jury question as to whether the restoration of the power, without checking the circumstances of the first outage, was negligence on the part of the defendant.

The judgment of the District Court is reversed.