[Civ. No. 12622.  First Dist., Div. Two.  Oct. 19, 1944.]

CHARLOTTE LEET, as Administratrix, etc., Respondent, v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY (a Corporation), Appellant.

Gibson, Sievert & Lockwood and Carlson, Collins & Gordon for Appellant.

Hildebrand, Bills & McLeod and Louis H. Brownstone for Respondent.

SPENCE, J.—Plaintiff brought this action under the provisions of the Federal Employers' Liability Act (45 U.S.C.A., § 51) to recover damages for the death of Frederick Waits, deceased. Following a trial by jury, judgment was entered in favor of plaintiff in the sum of $25,000 and from said judgment, defendant appeals.

The contentions of defendant on this appeal are first, that there was no substantial evidence showing any negligence on the part of defendant and second, that even assuming that the evidence was sufficient to show negligence on the part of the defendant, there was no evidence showing that such negligence was a proximate cause of the death of the deceased.

Deceased, who was employed as the head brakeman on one of defendant's westbound freight trains, was killed while standing on the eastbound track in the vicinity of said freight train at a refueling station in New Mexico known as Marmon. He was struck by defendant's passenger train known as "The Chief" which was proceeding along the eastbound track and was passing the standing freight train at a speed admittedly in excess of 70 miles per hour. It is conceded by defendant that the 1939 amendment to the Federal Employers' Liability Act (53 Stats. 1404, ch. 685, 45 U.S.C.A., § 54) completely abolished the carrier's defense of assumption of risk by the employee (see *Tiller* v. *Atlantic Coast Line Railroad Co.*, 318 U.S. 54, 67 [63 S.Ct. 444, 87 L.Ed. 610, 617, 143 A.L.R. 967]), and that long prior to 1939, the defense of contributory negligence had been eliminated as a complete defense and had

remained available to a defendant carrier only as a means of diminishing damages upon the theory of comparative negligence.   (45 U.S.C.A., § 53.)

The complaint was in two counts.  The first count charged negligence on the part of defendant in the operation of the passenger train which struck deceased.  The second count charged negligence on the part of defendant in failing to provide deceased with a reasonably safe place to work.  The pleadings and evidence indicate that it was plaintiff's theory on the second count that defendant was negligent because it had permitted "a large pile of hot cinders from engines of defendant to be and to remain adjacent to said eastbound track" thereby preventing deceased from performing his work at any place other than upon the eastbound track and thereby preventing deceased from escaping in the direction of the cinderpile from the danger of an approaching train.

In discussing the subjects of negligence and proximate cause, it is necessary to give a description of the scene of the accident.  Marmon is a refueling and rewatering depot located in the desert between Gallup and Belen in New Mexico. Defendant operates both coal-burning and oil-burning locomotives over this route and this depot is equipped for refueling these locomotives.  The depot is staffed by three employees of defendant and the structures in the vicinity consist only of cottages for housing the employees and of the necessary installation for accomplishing the refueling and rewatering.

For some distance east and west of Marmon, defendant's line was double tracked but defendant operated the line "left-handed."  In other words, the eastbound trains passed to the left rather than to the right of the westbound trains and along the northerly track rather than the southerly track.  East of Marmon, because of the grades, the tracks were not parallel at all points and at some points, they were two or three miles apart.  The "left-handed" operation was adopted to permit more efficient operation in the light of the nature of the grades encountered.  At Marmon and for some distance to the east and west, the tracks were parallel and about 14½ feet apart.  There was a slight down grade from the west to east in that vicinity.  To the east, the tracks ran straight for several miles.  To the west, the tracks ran straight for about 1,200 feet, then curved to the south, then straightened out and thereafter curved again to the north around a high bluff and into mountainous country.

There was a high coal chute constructed over the westbound track at Marmon. The northerly pillars supporting this chute were located between the eastbound and westbound tracks. It was at this point that coal-burning locomotives, such as the one which operated the freight train on which deceased was employed, stopped for the refueling and rewatering operations. In addition, the fire boxes of the coal-burning locomotives were cleaned. The ashes and klinkers were dumped on an iron sheet, were wet down with a hose and were then hauled away in a wheelbarrow and were dumped on the cinderpile north of the tracks. These ashes were hot and smoking when dumped. Approximately twelve freight trains per day ran west through this station and the cleaning operation resulted in the dumping of six to ten wheelbarrow loads of ashes per train. The cinderpile had been built up along the north side of the tracks until it was several hundred feet long from east to west, was 120 to 130 feet wide and was from three to five feet high at its highest points. The testimony was somewhat conflicting as to abruptness of the slope of the cinderpile from the northerly or eastbound track but there was ample evidence to show that the cinderpile rose quite abruptly in close proximity to the northerly track and was quite deep a few feet therefrom. There was also evidence to show that anyone attempting to walk on the cinderpile found very "rough" footing and that his feet would sink into the pile. There was also some conflict as to where the hot ashes lay and where the pile was smoking at the time. The evidence further showed that complaints had been made by and on behalf of the trainmen concerning the location and condition of this cinderpile.

The record discloses that the refueling, rewatering and cleaning operations resulted in a great deal of noise and dust which made it difficult to hear and see in the vicinity of the locomotive while it was engaged in such operations. In addition, the record discloses that just before and at the time of the accident, the automatic blower on the firebox of the locomotive of the freight train was in operation and that the locomotive was "popping off." The automatic blower is used to create a draft in the firebox when the locomotive is not in motion. "Popping off" is the term applied to the release of steam through valves located in the vicinity of the locomotive wheels. The evidence shows that when the noise created by

the operation of the blower and the noise created by the release of the steam was added to the other noises created by the operations mentioned, it was practically impossible for those in the vicinity of the locomotive to hear any other noise. Deceased, who was standing on the eastbound track opposite the westbound locomotive, apparently did not hear the whistle of "The Chief." The engineer and fireman of the freight train and the coal chute man, all of whom were in the vicinity of the locomotive, testified that they did not hear said whistle although there is no dispute that said whistle was blown. With respect to visibility, it appeared that the extreme July heat resulted in heat waves on the desert and that the added dust and smoke surrounding the engine made it difficult for anyone in the vicinity of the engine to see clearly for any great distance.

The westbound freight train consisted of 53 cars and was about one-half mile in length. When it arrived at Marmon at about 2 p. m. on July 7, 1942, the locomotive was spotted, in accordance with the usual custom, with the cab window just west of the westerly pillar of the coal chute. The members of the train crew then proceeded to perform the usual duties performed by them at this refueling station. The crew consisted of an engineer, a fireman, a conductor, a head brakeman and a rear brakeman. Deceased was the head brakeman. It was the duty of the engineer to oil and clean the engine; of the fireman to clean the firebox and cab; of the rear brakeman to protect the rear end of the train; and of the head brakeman to inspect the first half of the train, to receive signals from the rear brakeman and to pass the signals to the engineer. The conductor was in general charge of the train.

Deceased inspected the first half of the train and then assumed a position on the eastbound track opposite the cab of the locomotive. It was his duty to receive the signal from the rear brakeman at the end of the train and, owing to the difficulty of seeing under the conditions described, it was necessary for deceased to be out at least as far as the eastbound tracks. In order to pass the signal to the engineer, and to get back to the train quickly, it was necessary for deceased to be opposite the cab of the locomotive. The presence of the cinder-pile made it difficult if not impossible for deceased to station himself beyond and to the north of the eastbound track. The evidence showed that any location within 10 feet of "The Chief" while passing at 70 to 90 miles per hour, would have

been dangerous as a man in such close proximity would have been drawn into the train. While deceased was so standing waiting for the signal from the rear brakeman, "The Chief" proceeded on the eastbound track at the speed above indicated and struck and killed him.

On the day of the accident, "The Chief" was over six hours late. None of the crew of the freight train knew "The Chief" was still west of the freight train or had any reason to expect that it would pass them at Marmon. The engineer of "The Chief" testified that he was going 70 miles per hour as he rounded the last curve coming into Marmon and that he "tried to pick up more speed" on the slight down grade as he approached the station. No witness testified to a lower speed and some witnesses testified to a speed of 80 to 85 miles per hour on the curve. The engineer further testified that he "was trying to pick up the speed—to make a little time" and stated "I was going faster than I would be going if I was on time, of course." With regard to knowledge of the presence of the freight train at Marmon and of the presence of deceased on the eastbound track, the testimony of the engineer was quite clear. He testified that he saw the freight train when "The Chief" was about one-half mile west of Marmon and that he blew the whistle "because men are customarily working around those tracks." He further testified that he saw the deceased standing on the eastbound track when "The Chief" was about 800 feet distant. He stated, ". . . I was still a-going all the time, of course, and when I seen this man in the middle of the track, I just hung onto the whistle until after the time it happened and by that time I had applied the brakes." During the time he observed deceased, the latter did not move and the engineer did not apply the brakes until about 300 feet distant at which point the boiler at the front of the locomotive prevented him from seeing the deceased any longer. The application of the brakes eventually brought "The Chief" to a stop but not until it had struck deceased and had travelled over half a mile to a point where the engine of "The Chief" was two or three car lengths beyond the rear end of the freight train.

■ We are of the opinion that the foregoing evidence was ample to sustain the jury's implied findings on the issues of negligence and proximate cause. While the complaint was in two counts, we deem it unnecessary to refer to the allegations of the second count relating to the cinder pile except insofar

as the facts proved indicated one of the conditions existing at Marmon at the time that "The Chief" was operated toward the standing freight train at a speed which the jury was entitled to believe was close to 90 miles per hour. The conditions under which the freight train crew and refueling station crew worked at Marmon were known to the engineer of "The Chief." The danger of operating a train at a speed of approximately 90 miles per hour at a point where men were required to work in close proximity was likewise known. We believe that the jury could reasonably conclude that it was negligence to operate "The Chief" at such speed under the conditions existing and that such negligence was a proximate cause, if not the sole proximate cause, of the death of the deceased.

Defendant refers to a "permissible speed" of 65 miles per hour on the curve and of 90 miles per hour on the straight away. It states that the fact that "The Chief" proceeded at a speed in excess of 65 miles per hour around the curve 1,200 feet from Marmon is "remote and wholly immaterial" and that as the speed of "The Chief" was less than 90 miles per hour after rounding the curve the speed at the point of the accident was "legal." It therefore takes the position that as "no Statute, rule or regulation was being violated" at the time of the accident, there was no negligence. We cannot follow this argument. The question of whether the engineer of "The Chief" was negligent in the operation of his train was to be decided upon the basis of whether he was exercising ordinary care under the circumstances. The mere fact that he may have operated his train at a speed within the maximum limit which was prescribed by statute, rule or regulation as a straightaway speed, did not mean that he could not be found guilty of negligence for operating his train at such speed under the particular conditions and circumstances which existed at the time and place in question. (*Bush* v. *Southern Pacific Co.,* 106 Cal.App. 101 [289 P. 190]; *Whitmeyer* v. *Southern Pacific Co.,* 102 Cal.App. 199 [282 P. 1055]; *Carey* v. *Pacific Gas & Electric Co.,* 75 Cal.App. 129. [242 P. 97]; 19 Cal.Jur. 634.) Defendant quotes certain language from *Hoffman* v. *Southern Pacific Co.,* 101 Cal.App. 218 [281 P. 681]; and *Friddle* v. *Southern Pacific Co.,* 126 Cal.App. 388 [14 P.2d 568], but we find nothing in those cases which is contrary to the views which we have expressed. Defendant also quotes the rule stated in 44 American Jurisprudence 705

but concedes that most of the cases cited in support of the rule were cases involving injured persons who were not employees of the railroad company. We find no case which sustains the view that the questions of negligence and proximate cause were not questions for the jury under the circumstances presented by the record before us. We believe that the late cases involving the Federal Employers' Liability Act indicate that said questions were properly submitted to the jury for their determination. (*Tiller* v. *Atlantic Coast Line R. R. Co.*, 318 U.S. 54 [63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967] ; *Bailey* v. *Central Vermont Ry. Co.*, 319 U.S. 350 [63 S.Ct. 1062, 87 L.Ed. 1444] ; *Tennant* v. *Peoria & P. U. Ry. Co.*, 321 U.S. 29 [64 S.Ct. 409, 88 L.Ed. ——] ; *Tuller* v. *Atchison, T. & S. F. Ry. Co.*, 62 Cal.App.2d 852 [145 P.2d 321].)

The judgment is affirmed.

Nourse, P. J., and Goodell, J. pro tem., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 4, 1944.