[Civ. No. 8560. Third Dist. Aug. 1, 1955.]

ONA C. KEIPER, as Administratrix, etc., Respondent, v. NORTHWESTERN PACIFIC RAILROAD COMPANY (a Corporation), Appellant.

Mannon & Brazier, Mannon, Brazier & Bell and Dunne, Dunne & Phelps for Appellant.

Burke & Rawles and Wayne P. Burke for Respondent.

FINLEY, J. pro tem.*—This appeal is from a judgment entered upon the verdict of a jury in favor of plaintiff as administratrix, awarding damages on account of the death of her husband.

In the early morning of October 28, 1949, the severed body of Ralph J. Keiper, a welder employed by appellant Northwestern Pacific Railroad Company, was found lying just outside of the westerly rail of the company's main line track at a siding south of Ukiah known as Echo. Near that point a narrow raised roadway of dirt or gravel crossed the track at approximate right angles, and also the siding track lying just to the west of it. There was a gate on each side of the tracks where this road intersected the right of way fences.

---

*Assigned by Chairman of Judicial Council.

The upper part of the severed body was found lying just on the southerly edge of this dirt or gravel roadway, while the lower part lay to the north and on the other side of the roadway about 20 feet from the upper part. On the siding which parallels the main track on the westerly side there had been spotted two so-called "outfit cars," the south end of the most southerly car being from 16 to 20 feet north of this raised dirt roadway. The lower part of the body lay nearly opposite the said south end of this car which had been allocated to the deceased as living quarters while working at Echo. In the middle portion of this car, on either side, there was a door below which had been permanently attached two steps leading to the ground, and along one side of each doorway was a metal handle or "grabiron" to assist one in using the steps. A short distance to the west of the car on the opposite side thereof from the main track, there had been placed a privy for the use of the deceased, and a path leading to it had been cut through the grass growing between it and the car.

There is no material conflict in the evidence. Plaintiff offered no direct proof of how the tragedy occurred. The factual situation was developed almost entirely by the defense. According to the testimony of his immediate superior, called as a defense witness, the deceased, a lead welder in the employ of appellant, had been sent to Echo to build rail jetties where an adjacent creek had washed out a portion of the right of way. He had moved into the outfit car assigned to him "the day before." He was the only one who used it. It was not necessary for him to live there. He could have lived at home and driven back and forth had he chosen to do so. Outside of an emergency his assigned hours of work were from 7 to 11 a. m. if on daylight saving time, or 8 a. m. to 12 noon, and from 12:30 to 4:30 p. m. if on standard time. These assigned hours are not changed but the welding gangs have no specified hours due to the heat. If it was exceptionally hot they worked early. The work deceased was assigned to do was not of an emergency nature.

This same witness also testified that deceased would take an occasional drink; that he had never seen him intoxicated; and that deceased was a careful man around trains. He further testified that there was blood on the west rail of the main track approximately 90 feet south of the outfit car occupied by deceased; that there was what looked like a foot-

print near the entrance to this car between the two main line rails, and that about opposite the south end of this car there was also a scraping such as might have been made by the side of a foot. There was blood on the rails nearly opposite.

According to this same witness, from four to six trains passed over this area between 6:30 on the evening of October 27, 1949, and daylight the next morning.

In addition to this witness, defendant also called Harvey O. Peters, a special agent; Roy J. Connors, the locomotive engineer on the train that passed Echo about 10 o'clock on the night of October 27, 1949; and also W. J. Egan, the roundhouse foreman at Santa Rosa. The fireman who served with engineer Connors on the night in question had died before the date of trial.

Connors testified that his train consisted of 47 freight cars, 41 loaded and six empty. As he approached the outfit cars at Echo the speed of the train was about 18 miles per hour or less. The headlight was on high beam and illuminated the track 20 car lengths away; the track could be seen clearly for approximately 15 car lengths, but beyond that it would not appear distinctly. The locomotive whistle was sounded at the mile board, one mile from Echo and also as he came around the turn when he observed the outfit cars on the siding. He sounded the whistle a second time as he approached them. The locomotive bell was ringing. As he approached the outfit cars he saw nothing on the tracks and the fireman gave him no warning of any sort. He, Connors, had a full view of the entire width of the main track and was carefully observing conditions within the range of his headlights. He did not strike anyone, and when he was informed the next morning that a man had been killed at Echo, he looked the locomotive over but found no blood on it, and no one pointed out any blood to him. He would not be able to say whether there was any there.

W. J. Egan, the roundhouse foreman, testified that about 9 a. m. on October 28, 1949, he inspected this locomotive and found no blood on the pilot but did find eight or ten drops of blood on the No. 3 driver wheel which would be back approximately 25 feet from the front of the locomotive on the right side. He did not know whether it was human blood.

On rebuttal plaintiff recalled plaintiff's witness Reno Bartolomei who was a deputy sheriff and deputy coroner of Men-

docino County at the time of the accident, but who at the time of trial was an investigator for the district attorney and an automobile salesman. He testified from a memorandum contained in the sheriff's file and made by him of a telephone conversation allegedly held by him with a Henry P. Dohring who, at the time of the accident was in charge of defendant's station at Ukiah. He asked Dohring to check the engines. Dohring later called him back and said that engine 2625 was checked and that blood was found on the right side of the cowcatcher, on the pilot and on the front wheel on the right side. Dohring, also called by plaintiff as a rebuttal witness, could not recall this conversation or incident.

This in substance is all of the relevant testimony appearing in the record of any probative value to indicate what happened. No one saw the accident, nor was there any evidence to explain what the deceased was doing on or about the track. His body was found apparently run over and severed by a train, and that is all.

So far as we are concerned here, the only question to be answered is whether the verdict of the jury in the sum of $37,500 in favor of plaintiff can be sustained by this evidence under the provisions of the Federal Employers' Liability Act. The appeal is from the judgment entered upon this verdict and from the order denying defendant's motion for judgment notwithstanding the verdict.

The Federal Employers' Liability Act, so far as relevant here, provides in substance that a common carrier engaged in interstate commerce shall be liable to those designated in the act for injury to or death of any employee ''resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.'' The act also provides that contributory negligence of an employee who meets death or is injured shall not bar recovery, but that damages suffered shall be diminished in proportion to the amount of negligence attributable to the employee, provided however that such diminution shall not apply nor shall any doctrine of the assumption of risk apply in any case where there has been a violation by such common carrier of any statute enacted for the safety of employees and where this violation contributed to the occurrence of injury to or death of an employee.

All questions of substance presented in actions under

this statute are federal questions upon which the decisions of the federal courts are conclusive and binding upon all state courts. (*Atlantic Coast Line R. Co.* v. *Dixon,* 207 F.2d 899, 903; *Dice* v. *Akron, C. & Y. R. Co.,* 342 U.S. 359, 361 [72 S.Ct. 312, 96 L.Ed. 398]; *Bailey* v. *Central Vermont R. Co.,* 319 U. S. 350, 352 [63 S.Ct. 1062, 87 L.Ed. 1444]; *Garrett* v. *Moore-McCormack Co.,* 317 U. S. 239, 244 [63 S.Ct. 246, 87 L.Ed. 239].) This being so it is quite obvious that as an intermediate appellate state court our function here is not to attempt any interpretation of the act itself but to ascertain if possible the applicable rule from the existing federal decisions. We cannot resolve conflicts, and we speak with but little authority in attempting to select from among the federal decisions an applicable rule. Thus without authority, but speaking with little fear of contradiction, we concur with the trial judge in his observation that "the propositions of law applicable hereto are in such a state of confusion in the decisions of the higher courts, including the highest court of the land, that it [the trial court] is unable to determine just what the law applicable to the case is."

Counsel have filed excellent briefs and have discussed the cases at some length. In the light of our inability to establish precedent or resolve conflicts or to announce a rule with any perceptible authority, we see but little virtue in discussing here in any detail the maze of cases referred to in the briefs. About all we can do is weigh the evidence appearing in the record and announce our opinion as to whether giving to it all the weight to which it is entitled the evidence is legally sufficient to support the jury's implied finding of negligence on the part of defendant. In making such a determination we are satisfied that we must rely more upon what, in our opinion, would in the light of common, everyday contemplation and experience appear to amount to ordinary care, rather than upon any attempt to fit the facts before us into an indeterminate mold fashioned by the federal decisions.

First it may be said that there is not even a scintilla of evidence to indicate or support a finding that the decedent was engaged in any act connected with his employment at the time he met his death. In respondent's brief there appears this statement: "The evidence indicates that the deceased was on the railroad track at 10 o'clock P. M. on October 27, 1949, between the rails of the main line track, opposite to the entrance to his bunk car. This is indicated by the following: A. A foot print was found at this point, 18 inches inside

the west line, of the same size as the shoe worn by Mr. Keiper at the time of his death. It was deeper on one side than the other, and was headed in an easterly direction.''

There is no evidence to the contrary. This appears then as an admission that the death apparently did not occur before 10 p. m. It was not even suggested by anything in the evidence or otherwise that it did, or that the deceased was welding or otherwise working at that time of the night, or that he was engaged in any activity of any nature on the tracks at that hour which could be considered as being even remotely connected with his employment. The record is absolutely silent, and no plausible theory has been suggested, as to why he was there or what he was doing.

Respondent urges the following circumstances as constituting evidence of negligence under the act on the part of appellant:

''I. The bunk car furnished to deceased as living quarters had an entrance on the side next to the main line track, less than five feet from passing cars. ·

''II. The bunk cars were dark red, making them difficult to observe at night.

''III. No warnings were given by signs or otherwise to warn trainmen on the main line track of the fact that there were workmen living in these cars.

''IV. No precautions were taken by the defendant to protect workmen, living in bunk cars, against passing trains.''

Taking these specifications in order, the only evidence in the record is that the ''bunk'' or ''outfit'' car furnished to deceased had a similar entrance on both sides, and that when the body of deceased was discovered the doors to both these entrances were locked. There is no evidence that the deceased was, at the time, using the east entrance with the car spotted as it was on the siding west of the main track, or that the entrance on the west side was out of order or that there was any condition whatsoever that made it any less usable than the entrance on the east side. This leads us to the rule that if a choice of two equally usable doorways lay open to the decedent and he, of his own choice and volition, chose the dangerous way, particularly in light of his familiarity with bunk cars, tracks, trains and railroad practices in general (which must be logically assumed after, as the evidence shows, at least three years of railroad employment), it cannot be other than logically considered that he assumed any additional risk in using the more dangerous way. We do not see how appellant,

as his employer, could be held liable unless it were in some manner responsible for his making a choice of using the more dangerous of the two doors. The reason for two doors is obvious, for it is a matter of common knowledge that sidings occur on both sides of railroad main tracks, and the obvious purpose of having a door on each side is so that whether a car is spotted on one side or the other those having occasion to enter or leave such a car may do so on the side away from the main track.

Next respondent states that the cars were red and hence were difficult to see at night. We fail to see how this fact has any bearing on the situation. None of the cars was struck by the train. There is no evidence that the cars were not seen by all train crews as they approached and passed the cars, or that the conduct of any train crew would in the exercise of ordinary care have been any different had the cars been luminous or painted any other color. Also it is a matter of common knowledge that red is, and for many years has been, a color quite generally used on box cars, and it would be hardly logical to say that all of a sudden and for no especial reason, the spotting of bunk cars so painted should amount to negligence. Connors, the engineer of the locomotive on which the blood was found, testified that he knew the cars were there; that he sounded the whistle at the mile board one mile from Echo; that the headlight was on high beam and that the track could be seen clearly for approximately 15 car lengths ahead; that the whistle was sounded again as he came around the turn and observed the outfit cars on the siding, and a second time as he approached them; that also the locomotive bell was ringing. As appellant has pointed out, even though this testimony be entirely discounted and disbelieved, still there is no evidence in the record to support any inference or even a speculation that the color of the cars had any causal connection whatever with the death of deceased.

The above reasoning can in general be applied to respondent's third specification of negligence. There is no evidence that respondent violated any common or generally recognized custom or practice among railroads or acted in any manner without ordinary care and prudence in not posting special signs or otherwise to warn trainmen on the main track that there were workmen living in these cars. There is no evidence in the record to indicate that the absence of any warning "signs or otherwise" had any causal connection with the

death. As pointed out above, Connors, the locomotive engineer, stated that he observed the cars and blew the whistle; that he had blown it twice before, once at the mile board and once as he rounded the bend which was estimated by plaintiff's witness Bartolomei to be about a mile north of the bunk car. Connors also testified that the bell was ringing; that it had been turned on approximately 10 car lengths from where it was supposed to be heard, and that it rang automatically. He also testified that the speed of the train was 18 miles per hour or less.

There is nothing in the record to indicate that the operation of the train would have been any different had warning been "given by signs or otherwise to warn trainmen on the main line tracks of the fact that there were workmen living in these cars." Even if all defense testimony be disbelieved entirely, there is no evidence of any negligent operation of the train, unless it is to be inferred or presumed from the fact alone that because deceased was found dead and his body severed that the operation of the train was negligent.

The record contains no evidence at all to indicate any departure by appellant or any of its agents, servants or employees, from common and established practices in railroading, or the violation of any statute or any departure from what common experience would dictate as a standard of ordinary care. This tragedy happened at night. There was no evidence of any light in or about the bunk car or anything at all to indicate that deceased was, or had any occasion to be, on or perilously near the main line track. Had he been in the bunk car provided for him there is nothing to indicate that he would not have been perfectly safe. Why he was on or about the main line track at or about 10 o'clock at night no one knows. There is no evidence from which even an inference may be logically drawn that he was there for any purpose in connection with his employment. There is no evidence that he had any tools or equipment with him or even a light of any kind. There is no evidence that there was anything connected with his employment or personal needs to draw him at that time of night to any point at all on or east of the main track or indeed to any point east of the easterly wall of his bunk car. His privy was on the west side, away from the main track, and his bed presumably in the car. There is no evidence of any town, store, building, place of habitation, person or thing that might have drawn him across the track at that hour. Indeed there is not even evidence

that he met his death by being run over by a train. There was testimony by plaintiff's witness Bartolomei that when he found the body the door on the east side of the bunk car was locked. There was other testimony that the doors on both sides were locked. It seems strange that a man, at least one experienced around railroads, in possession of his faculties and under normal circumstances, would at that time of night be, for no fathomable reason, where deceased must have been for his body to have been run over and severed by the train. Any hypothesis must of necessity be based upon pure speculation. ■ It is true that respondent is entitled to the presumption that deceased was exercising due care for his own safety, but as a corollary it does not follow that indulgence in this presumption leads to the conclusion or presumption, or even inference, that appellant was negligent or that this negligence was the proximate cause of death. (*Looney* v. *Metropolitan R. Co.*, 200 U. S. 480, 488 [26 S.Ct. 303, 50 L.Ed. 564, 569].) If we are to speculate, it might as well be said that deceased fell on the rails as the result of a heart attack or some other organic or functional failure, or that someone killed him and placed his body on the track to lend the appearance of accident. In answer to this it might be said that even so the locomotive engineer or fireman, if they were maintaining a proper lookout, should have seen the body on the track. We do not feel that the law or reason binds appellant to any such degree of care under the appellation of ordinary care. Had the engineer or fireman known, or if in the exercise of ordinary care they should have known, or even if they had had any reason to anticipate anyone on the track at that point at that time of night, it might in reason be said that they should have been vigilant in maintaining a most careful scrutiny of every foot of track. But here we can think of nothing which, under the circumstances, might in reason have caused them to anticipate the presence of anyone on the track, or dangerously close to it, at that point, at that time of night, even though they were chargeable with knowledge that workmen were quartered in the bunk cars. ■ We do not think that in order to comply with the standard "ordinary care" an engineer or fireman of a locomotive can be charged with the duty of carefully watching every foot of a track from point of departure to destination excepting those points where they know, or in the exercise of ordinary care, should have reason to know or anticipate that the passage of the train might create a hazard to persons or property. A right of way

is owned and maintained by a railroad for the passage of its rolling stock, and excepting at known intersections or where the presence of children might be anticipated, or at known points of possible danger, or at points where it could, in the exercise of ordinary care, be reasonably anticipated, it seems that the train crews should be conceded some time for attention to their gauges and instruments and the management of their controls, and should not, under penalty of being found guilty of negligent conduct, be bound at all times to keep their eyes focused upon the track ahead.

We hold that under the circumstances here there was, at the time and place involved and in the exercise of ordinary care and prudence, no reason for the engineer or fireman to maintain a constant and intense vigil over each and every foot of the track ahead, for even though if charged with knowledge of the presence of workmen in the bunk cars, there appears no fathomable reason to expect the presence of any one of them on or perilously near the main track at that time of night.

▉ In view of the salient points of similarity involved and persuaded by the reasoning and conclusions reached in *Lenz* v. *Union Pac. R. Co.*, 128 Neb. 99 [258 N.W. 33]; *Lammers* v. *Pacific Elec. Ry. Co.*, 186 Cal. 379 [199 P. 523]; and *Greene* v. *Atchison, T. & S. F. Ry. Co.*, 120 Cal.App.2d 135 [260 P.2d 834, 40 A.L.R.2d 873]; and guided by the rules announced in *Moore* v. *Chesapeake & O. R. Co.*, 340 U.S. 573 [71 S.Ct. 428, 95 L.Ed. 547]; *Chesapeake & Ohio Ry. Co.* v. *Thomas*, 198 F.2d 783, 788; *Kansas City So. R. Co.* v. *Jones*, 276 U.S. 303 [48 S.Ct. 308, 72 L.Ed. 583]; *Looney* v. *Metropolitan R. Co.*, 200 U.S. 480, 488 [26 S.Ct. 303, 50 L.Ed. 564, 569]; and *Davis* v. *Alabama Great So. R. Co.*, 324 U.S. 846 [65 S.Ct. 676, 89 L.Ed. 1407], we hold that as a matter of law the record is totally devoid of evidence to support a finding of negligence on the part of defendant, and that the trial court should have granted appellant's motion for judgment notwithstanding the verdict.

The judgment is reversed with directions to the trial court to enter judgment for appellant notwithstanding the verdict.

Van Dyke, P. J., and Schottky, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied September 21, 1955. Gibson, C. J., and Carter, J., were of the opinion that the petition should be granted, and Carter, J., filed the following opinion:

CARTER, J.—This case was tried before a most able and conscientious judge and a jury composed of substantial citizens of Mendocino County. The effect of the decision of the District Court of Appeal is to deny plaintiff a jury trial in a case where such a trial is a matter of right under both the Constitution of the United States and of California as well as under federal and state statutes.

Since this is a case which may be reviewed by the Supreme Court of the United States, I am constrained to file a dissenting opinion to the order of the Supreme Court of California denying plaintiff a hearing for the purpose of calling attention to the errors in the opinion of the District Court of Appeal, on which its conclusion is based so that such errors may be called to the attention of the Supreme Court of the United States in the event the case is ultimately presented to that court.

The District Court of Appeal not only reversed the judgment in this case upon an erroneous assumption of the factual situation and application of the law thereto, but directed that a judgment be entered in favor of the defendant notwithstanding the verdict, thus depriving plaintiff of an opportunity to retry the case and present additional evidence in support of her causes of action in the event such evidence is available to her.

In my opinion the decision of the District Court of Appeal in this case not only erroneously denies plaintiff the right to a trial by jury but will result in a gross miscarriage of justice.

The decedent, Ralph Keiper was employed by the defendant railroad as a welder and had been sent to Echo, a siding south of Ukiah, to build rail jetties where a portion of the right of way had been washed away. Two "outfit" (living quarters) cars had been spotted on the siding which paralleled the main line track. One of these cars was assigned to the decedent as his living quarters while on this job. He was the only one using the car. The siding on which the car was spotted was a few feet west of the main line track. In the middle portion of the car assigned to decedent there were two doors, one opening on the side next to the main line track, the other on the side away from it.

On the morning of October 28, 1949, the severed body of Ralph Keiper was found lying just outside the westerly rail of the defendant company's main line track. Inspection of the locomotive of a train which had passed the siding at about

10 p. m. the night before, showed that the pilot (cowcatcher) had been bent back and that there was blood on the wheels. Footprints and a scuff mark indicated that decedent had been between the rails of the main line track, about even with his living quarters car, when struck by the locomotive.

During the trial of this action, brought by Keiper's widow as administratrix of his estate, under the Federal Employers' Liability Act, the engineer of the locomotive above mentioned testified that his speed as he passed the Echo siding was about 18 miles per hour, that the headlight was on high beam and illuminated the track 20 car lengths away, that he sounded the whistle about one mile from Echo, that he saw nothing on the tracks as he approached the outfit cars.

The jury rendered a verdict in favor of plaintiff in the sum of $37,500. Defendant's motion for judgment notwithstanding the verdict was denied. The District Court of Appeal reversed the judgment entered on the verdict, holding that there was no evidence to support the jury's finding of negligence on the part of defendant.

The FELA (Federal Employers' Liability Act) provides in substance that a common carrier engaged in interstate commerce shall be liable to those designated in the act for injury to or death of any employee ''resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, boats, wharves, or other equipment.'' Prior to 1939 the accomplishment of the purpose of the act—to place on the employer some of the cost of the injuries and lives which it consumed in its operations—was somewhat hampered by the engrafting of defenses such as contributory negligence, assumption of risk, etc. The act was amended by Congress in 1939 to eliminate some of these defenses. (See *Wilkerson* v. *McCarthy*, 336 U.S. 53 [69 S.Ct. 413, 93 L.Ed. 497].) The act now provides that contributory negligence of an employee who meets death or is injured shall not bar recovery but that damages suffered shall be diminished in proportion to the amount of negligence attributable to the employee, provided however that such diminution shall not apply nor shall any doctrine of the assumption of risk apply in any case where there has been a violation by such common carrier of any statute enacted for the safety of employees and where this violation contributed to the occurrence of injury to or death of an employee.

All questions of substance presented in actions under this

statute are federal questions upon which the decisions of the federal courts are conclusive and binding upon all state courts (*Atlantic Coast Line R. Co.* v. *Dixon,* 207 F.2d 899; *Dice* v. *Akron, C. & Y. R. Co.,* 342 U.S. 359 [72 S.Ct. 312, 96 L.Ed 398]; *Bailey* v. *Central Vermont R. Co.,* 319 U.S. 350 [63 S.Ct. 1062, 87 L.Ed. 1444]).

The jury verdict in favor of plaintiff was on two counts of his complaint, based respectively on negligence of the defendant in failing to provide a safe place to work, and upon negligence in the operation of the train. The issues raised on the appeal and decided by the District Court of Appeal in favor of defendant were: (1) Is there any evidence of negligence in failing to provide a safe place to work? (2) Is there any evidence on negligence in the operation of the train? (3) Is there any evidence that deceased was employed, within the provisions of the FELA, at the time of his death?

On the issue of employment, there was evidence that a bunk car had been assigned to the decedent and was transported by defendant from place to place on its lines for his living quarters, so that he might be close to his work. There was evidence that his job was that of welding rails, and at the particular time in question, he was at the particular location for the purpose of welding rails in constructing jetties to prevent river damage.

In *Lukon* v. *Pennsylvania R. Co.,* 131 F.2d 327, it was held that an employee who had stopped work and was walking along the tracks in the direction of his home was within the act and an employee at the time. It was stated at page 329: "The Federal Employers' Liability Act was designed to be applied liberally for the protection of the railroad and other employees."

A member of a track gang employed in Tennessee who had left the work site for the weekend to go to his home in North Carolina, was held to be engaged in the duties of his employment when he returned to his assigned bunk car on Friday night after missing a train home, and was injured in the explosion of a lamp used to furnish light for the bunk car. (*Atlantic Coast Line R. R.* v. *Meeks,* 30 Tenn.App. 520 [208 S.W.2d 355].)

Where an engineer was on his way to the boarding house, but was shortly to depart upon his run, and had not gone beyond the limits of the railroad yard when he was struck, the court held that he was on duty and employed in commerce.

716

(*North Carolina R. Co.* v. *Zachary,* 232 U.S. 248 [34 S.Ct. 305, 58 L.Ed. 591].)

A workman injured crossing the employer's tracks in his automobile while returning to the job in the morning was employed within the FELA. (*Flack* v. *Delaware, L. & W. R. Co.,* 45 F.2d 683.)

One who had finished his work and was leaving held to be still an employee under the FELA. (*Erie R. Co.* v. *Winfield,* 244 U.S. 170 [37 S.Ct. 556, 61 L.Ed. 1057].)

An employee who was assigned a bunk car to sleep in, but who, due to hot weather and vermin in the bunk car, decided to sleep outside, where a train cut off his foot, was held to be an employee at the time of the injury and entitled to recover from the railroad company. (*Mostyn* v. *Delaware, L. & W. R. Co.,* 160 F.2d 15.)

In a case very similar to the case at bar, decided in the Ninth Circuit, an employee struck on the main line track next to his assigned bunk car over an hour before he was due to begin work for the day was held to be "undoubtedly" in the defendant's employ and engaged in interstate service. The employee was hit while crossing the track to visit the toilet. It was stated: "By the condition of his employment, he was necessarily on appellant's premises and was making necessary preparation for the work in which he was to engage one and one-half hours later, in a reasonable manner and within a reasonable time." (*Chicago, M., St. P. & P. R. Co.* v. *Kane,* 33 F.2d 866.)

The evidence in the present case indicating negligence in furnishing an unsafe place to work includes testimony and exhibits showing that the bunk car furnished to decedent as living quarters had an entrance on the side next to the main line track, less than 5 feet from passing cars; that the bunk cars were dark in color, making them difficult to observe at night; that no warnings were given by signs or otherwise to warn trainmen on the main line track of the fact that there were workmen living in these cars; that no precautions were taken by the defendant to protect workmen, living in the bunk cars, against passing trains. Many cases indicate that the dangerous condition of the premises can be inferred from the evidence in the record in the case at bar. (*Lavender* v. *Kurn,* 327 U.S. 645 [66 S.Ct. 740, 90 L.Ed. 916] ; *Bailey* v. *Central Vermont Ry.,* 319 U.S. 350 [63 S.Ct. 1062, 87 L.Ed. 1444] ; *Atlantic Coast Line R. R.* v. *Meeks,* 30 Tenn.App. 520 [208 S.W.2d 355].)

Evidence of negligence in the operation of the train includes: (1) Evidence indicating that the deceased was on the railroad track at 10 p. m. on October 27, 1949, between the rails of the main line track, opposite the entrance to his bunk car. This evidence includes footprints, scuff marks, blood on the pilot and driver wheels of the locomotive which passed the siding at 10 o'clock and blood on the west rail from the location of the footprint and scuff marks south for about 90 feet; the cowcatcher or pilot, was bent back about three inches indicating that the front of the engine had struck something; the fact that Mr. Keiper's body was severed in two pieces. (2) Evidence indicating that the view of the decedent at this location was such that the engineer should have seen him. This evidence includes testimony that the tracks were straight for one mile to the north and one-half mile to the south; that there were no weeds or other obstructions present to obstruct the view; that Mr. Keiper's clothing was of a type which should have been easily seen; that the engine was equipped with a headlight which clearly illuminated the area from the engine to a distance of 750 feet ahead; that the engineer and fireman of the engine had ample opportunity to observe. (3) Evidence that the engineer failed to see Mr. Keiper. (4) Evidence that the engineer failed to blow the locomotive whistle to give warning, while passing the cars, excepting that he blew it at a distance of approximately one mile to the north.

The District Court of Appeal opinion cites eight cases as supporting its conclusion that, as a matter of law, the record was devoid of evidence to support a finding of negligence on the part of defendant. (*Lenz* v. *Union Pac. R. Co.*, 128 Neb. 99 [258 N.W. 33] ; *Lammers* v. *Pacific Elec. Ry. Co.*, 186 Cal. 379 [199 P. 523] ; *Greene* v. *Atchison, T. & S. F. Ry. Co.*, 120 Cal.App.2d 135 [260 P.2d 834, 40 A.L.R.2d 873] ; *Moore* v. *Chesapeake & O. R. Co.*, 340 U.S. 573 [71 S.Ct. 428, 95 L.Ed. 547] ; *Looney* v. *Metropolitan R. Co.*, 200 U.S. 480 [26 S.Ct. 303, 50 L.Ed. 564] ; *Chesapeake & Ohio Ry. Co.* v. *Thomas*, 198 F.2d 783 ; *Kansas City Southern Ry.* v. *Jones*, 276 U.S. 303 [48 S.Ct. 308, 72 L.Ed. 583] ; and *Davis* v. *Alabama Great Southern R. Co.*, 324 U.S. 846 [65 S.Ct. 676, 89 L.Ed. 1407].)

The Lenz case was decided in 1934, five years prior to the amendment liberalizing the FELA. The decision was apparently based on the defense of contributory negligence.

The Lammers case was not decided under the rules applicable to actions brought under the FELA. The plaintiff there

was a passenger, not an employee of the defendant. The question for decision there was whether the ejection of the intoxicated plaintiff was the proximate cause of his subsequent injuries. There was no evidence to indicate that plaintiff had been on the track.

In the Greene case, there was no evidence that the decedent —a licensee on the defendant's premises, not an employee— had been on the track nor that he had been clearly visible to the engineer. The court in the Greene case cited with approval the rule that an engineer could be held to have been negligent for failure to look or looking, failure to see a person on the tracks, but held that rule not applicable for the reason that there was no evidence to indicate that the decedent had been on the track.

*Moore* v. *Chesapeake & O. R. Co.*, 340 U.S. 573 [71 S.Ct. 428, 95 L.Ed. 547], held that the jury may believe or disbelieve all or a part of the testimony it hears in arriving at its verdict. In that case it was held that the railroad was not negligent where its train ran over the decedent after he toppled from the train. The engineer was in the process of stopping when plaintiff was run over.

The Looney case was decided before the amendment of 1939. A case similar in its facts to the Looney case, but arising after 1939, held that the matter should have been submitted to the jury. (*Sweeting* v. *Pennsylvania R. Co.*, 142 F.2d 611.)

The other cases relied upon by the District Court of Appeal may be similarly distinguished. It is worthy of note that in none of the cases cited by the District Court of Appeal was there any evidence that the deceased or injured person had been on the tracks in front of the train.

In contrast to the cases cited by the District Court of Appeal in support of its decision, many cases, both in California and in the federal courts, have indicated that evidence similar to that presented in the present case raised questions of fact properly submitted to the jury for determination. (*Leet* v. *Atchison, T. & S. F. Ry. Co.*, 66 Cal.App.2d 413 [152 P.2d 351]; *Weiand* v. *Southern Pac. Co.*, 34 Cal.App.2d 500 [93 P.2d 1023]; *New York Cent. R. Co.* v. *Marcone*, 281 U.S. 345 [50 S.Ct. 294, 74 L.Ed. 892]; *Tiller* v. *Atlantic Coast Line R. Co.*, 318 U.S. 54 [63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967]; *Bailey* v. *Central Vermont Ry.*, 319 U.S. 350 [63 S.Ct. 1062, 87 L.Ed. 1444]; *Tennant* v. *Peoria & P. U. Ry. Co.*, 321 U.S. 29 [64 S.Ct. 409, 88 L.Ed. 520]; *Tiller* v. *Atlantic*

*Coast Line R. Co.*, 323 U.S. 574 [65 S.Ct. 421, 89 L.Ed. 465]; *Jesionowski* v. *Boston & Maine R. Co.*, 329 U.S. 452 [67 S.Ct. 401, 91 L.Ed. 416, 169 A.L.R. 947]; *Pennsylvania R. R.* v. *Goldie*, 182 F.2d 9; *Norfolk & W. Ry. Co.* v. *McKenzie*, 116 F.2d 632.)

Where, as here, questions of fact have been properly submitted to the jury, the appellate courts are not at liberty to set aside the jury's findings and draw other inferences and conclusions. Here there is ample evidence to support the findings of the jury. The fact that other inferences might reasonably be drawn from the same evidence does not justify the reversal of this judgment. (*Tennant* v. *Peoria & P. U. Ry. Co.*, 321 U.S. 29 [64 S.Ct. 409, 88 L.Ed. 520]; *Johnson* v. *Southern Pac. Co.*, 154 Cal. 285 [97 P. 520]; *Seller* v. *Market Street Ry. Co.*, 139 Cal. 268 [72 P. 1006].)

I have heretofore in numerous concurring and dissenting opinions endeavored to point out what I believe to be a trend in the decisions of both the Supreme Court of California and some of the District Courts of Appeal to deprive litigants of their constitutional right to a trial by jury. (*Rodabaugh* v. *Tekus*, 39 Cal.2d 290 [246 P.2d 663]; *Hawaiian Pineapple Co.* v. *Industrial Acc. Com.*, 40 Cal.2d 656 [255 P.2d 431]; *Better Food Mkts., Inc.* v. *American Dist. Tel. Co.*, 40 Cal.2d 179 [253 P.2d 10]; *Atkinson* v. *Pacific Fire Extinguisher Co.*, 40 Cal.2d 192 [253 P.2d 18]; *Sutter Butte Canal Co.* v. *Industrial Acc. Com.*, 40 Cal.2d 139 [251 P.2d 975]; *Mercer-Fraser Co.* v. *Industrial Acc. Com.*, 40 Cal.2d 102 [251 P.2d 955]; *Gill* v. *Hearst Publishing Co.*, 40 Cal.2d 224 [253 P.2d 441]; *Goodman* v. *Harris*, 40 Cal.2d 254 [253 P.2d 447]; *Pirkle* v. *Oakdale Union etc. Sch. Dist.*, 40 Cal.2d 207 [253 P.2d 1]; *Burtis* v. *Universal Pictures Co., Inc.*, 40 Cal.2d 823 [256 P.2d 933]; *Kurlan* v. *Columbia Broadcasting System, Inc.*, 40 Cal.2d 799 [256 P.2d 962]; *Weitzenkorn* v. *Lesser*, 40 Cal.2d 778 [256 P.2d 947]; *Turner* v. *Mellon*, 41 Cal.2d 45 [257 P.2d 15]; *Barrett* v. *City of Claremont*, 41 Cal.2d 70 [256 P.2d 977]; *Estate of Lingenfelter*, 38 Cal.2d 571 [241 P.2d 990]; *Gray* v. *Brinkerhoff*, 41 Cal.2d 180 [258 P.2d 834]; *Estate of Welch*, 43 Cal.2d 173 [272 P.2d 512].) Since the decision of the District Court of Appeal in the case at bar falls into the pattern of the last cited cases, I cannot refrain from again expressing my disapproval of this trend which, in my opinion, is pervasive and perversive of one of the most sacred constitutional guarantees heretofore enjoyed by the American people.

From the foregoing it is clear that the Supreme Court of California should have granted plaintiff's petition for hearing in this case and affirm the judgment of the trial court.