[L. A. No. 6457.   In Bank.—June 28, 1921.]

RICHARD LAMMERS, Respondent, v. PACIFIC ELEC-
TRIC RAILWAY COMPANY (a Corporation), Appellant.

[1] NEGLIGENCE—EJECTION OF PERSON FROM RAILWAY TRAIN—SUBSEQUENT INJURY FROM ANOTHER TRAIN—PROXIMATE CAUSE OF INJURY.—A railway company is not liable for personal injuries received by a person from being struck by one of its trains after he had been expelled from another of its trains for failure to produce a ticket or pay his fare, although he was in a helpless condition caused either by malady or liquor, where the injuries were sustained three-quarters of a mile from the place where he was ejected and more than six hours had elapsed between the time of ejection and the time of injury, where the only negligence alleged was in such expulsion, since such ejection was not the proximate cause of the injury.

APPEAL from a judgment of the Superior Court of Los Angeles County.   Leslie R. Hewitt, Judge.   Reversed.

---

1.   Ejection by carrier of sick or intoxicated passenger as proximate cause of subsequent injury or death, note, L. R. A. 1915C, 142.

The facts are stated in the opinion of the court.

Frank Karr, R. C. Gortner, E. E. Morris, W. R. Millar and C. W. Cornell for Appellant.

Earl Rogers and Charles E. Williams for Respondent.

WILBUR, J.—The facts are correctly stated in the opinion of the district court of appeal, and we adopt that statement of the facts, but with certain minor changes. For that reason we do not use quotation marks.

This is an appeal from a judgment awarding plaintiff the sum of two thousand five hundred dollars as damages for personal injuries sustained, so it is alleged, as the result of being wrongfully expelled by defendant's conductor from its passenger train while in a helpless condition and unable to care for himself at a time and place where he was likely to be injured by other cars of defendant which were being operated at and past the point of ejectment at frequent intervals.

The injuries suffered were serious. The left limb of plaintiff was crushed by the car-wheels passing over it at a point which made it necessary to amputate it above the knee. Several ribs were broken and he was otherwise injured.

At the time he sustained injuries plaintiff was about thirty years of age. He was low in mentality and scarcely able to converse intelligently on very ordinary subjects. He had been subject to epileptic seizures or some other nervous affection strongly resembling epilepsy, since the age of fourteen years, having as many as two convulsions a month. This affliction, together with his mental feebleness, made it unsafe for him to work with machinery or attempt any labor requiring the exercise of unusual care. He was, therefore, doomed to the performance of the simpler tasks of life.

While not habitually addicted to the use of intoxicating liquor. he was known to have indulged in its use upon occasions to a noticeable degree.

His home was near El Monte, some distance out of the city of Los Angeles and on the line of defendant's electric railway connecting Los Angeles with various suburban districts.

Plaintiff purchased a ticket at El Monte for Los Angeles and return on the evening of May 22, 1917. The purpose of the trip made by him to Los Angeles on this evening was to purchase some minor articles. On returning he took the 10:10 P. M. car for El Monte, occupying a seat with an elderly gentleman near the rear of the car. The conductor testified that plaintiff, when first observed by him, was "slouched down" in his seat with his hat over his face, presenting the appearance of a man half asleep or intoxicated. In response to a request for his fare plaintiff took out his pocketbook but was unable to find either ticket or money. The conductor had difficulty in getting audible or intelligent utterances from him. Upon being questioned as to his destination he stated that he was "going where dad went," referring to the elderly gentleman seated at his side. When further questioned by the conductor as to where "dad" was going, plaintiff replied, "El Monte."

Without any apparent reason therefor, plaintiff said that "dad" would pay his fare. The conductor asked the elderly gentleman if plaintiff was a member of his party and received a negative answer. Apparently he had no acquaintance with plaintiff. Being unable, after a "jumbling" search, to find either ticket or fare, plaintiff was told, according to the testimony of the conductor, to get off the train at Covina Junction, about 10:25 P. M. This he did with the conductor's assistance. The next morning at about 5 o'clock he was found near the left rail of the out-bound track about three-quarters of a mile east of Covina Junction, badly mangled. Evidently he had attempted to make his way home. The defendant operates a double-track system from Covina Junction past the point where plaintiff was found.

Covina Junction is a railway junction in Los Angeles City. The train carrying plaintiff was a through train to El Monte. Covina Junction is a transfer point for passengers destined for Pasadena, Alhambra, and other points on the Pasadena Short Line, operated by the defendant.

It is the stipulation of counsel that "Covina Junction . . . is one of these little places where passengers can sit, but not in charge of anyone, and with no agent there; one of these shelters with a seat and a roof over it." There is, however, testimony seemingly in conflict with the stipu-

lation and to the effect that the waiting-room was about ten feet square with glass on four sides. The nearest residence house was about one hundred feet from the station situated on a slight bluff or elevation at the end of a bridge. The next nearest structure was defendant's substation, about 150 feet distant. The testimony is uncertain as to whether or not either of said buildings was actually occupied by anyone at the time of the injury. The next nearest residence was from one-eighth to one-quarter of a mile east of the station. The roadbed of the track leading away from the station was built within the limits of a barranca with slight bluffs on either side. Especially is this true as to the elevation of the inhabited territory on either side. Excavations and depressions appear to have existed in the earth near the track along the route.

The conductor described plaintiff's condition as follows: "I took hold of him, his left elbow, or arm—some place on the left side to assist him down the steps as he appeared very wobbly—couldn't walk very well. He staggered before he reached the steps. He walked probably ten feet to the door."

The conductor further testified that plaintiff did not fall at the time he left the car, but walked off a "little bank there in this ditch, walked down this ditch and that is the last I saw of him. I thought he might be down there until he sobered up."

The elderly gentleman, Professor Hagen, a teacher of music, and one or two other passengers described the appearance of the plaintiff as a person plainly under the influence of liquor. He had offered the professor a drink from a pint bottle which he drew from his pocket. His articulation was indistinct. "Anyone could tell that he was not right," is the way it was put. After being assisted from the platform to the ground he is described as "leaning backward and forward on his feet."

Witness E. H. Watson testified that plaintiff was very drunk. "I heard him make some foolish remarks; that is how my attention was called to him in the first place." Mr. Watson further testified that plaintiff had two bottles of whisky in his pockets. The testimony of the several witnesses who took special notice of plaintiff makes it clear that the power of locomotion was plainly affected and a deficient

or disturbed mental condition was apparent. His conduct was neither boisterous nor offensive.

As a matter of fact, plaintiff had in his possession at all times a ticket entitling him to travel as a passenger, but he was unable to produce it at the time it was demanded. His speech was incoherent then as it was when a witness several months thereafter. Witnesses who had known plaintiff for a great many years described his affliction, its effect upon him, and the duration of said seizures,

Plaintiff seems to have denied that he was or had been drinking at the time he was expelled from the train. He claimed that the conductor charged him several times with being "stewed." He also intimated that he was not given a full opportunity to find his ticket. He insists, so far as any intelligent conclusion may be drawn from his testimony, that a "spell" was coming over him such as he was afflicted with and that he gradually lost consciousness. No one tasted or examined the contents of the bottles that some of the witnesses say he was carrying. One or two witnesses who came into close contact with him after the injury thought they smelled the odor of liquor on his breath, while a like number with equal opportunity failed to detect any odor of liquor. It is immaterial, however, whether the condition was brought about by malady or liquor. The question is, Was he in a helpless condition and unable to care for himself, and if so, was it negligence on the part of defendant's agent to eject him under the circumstances of the situation at the point at which he was ordered and helped from the train? At least five out-bound trains at rather equal intervals passed over the way he had traveled between the time of ejection and the hour that he was found. The number of in-bound trains is not given, as the injury occurred on the inner rail of the out-bound track. Physical evidence places it beyond question that the injury was caused by the wheels of defendant's cars passing over plaintiff's limb. No member of any one of the several train crews passing after plaintiff was ejected was produced who claimed to know anything about the injury. Plaintiff was discovered by a third party.

From the foregoing statement of facts by the district court of appeal it is to be observed that the plaintiff had traveled three-quarters of a mile from the point where he was ejected

from the train to the point where he was injured and that more than six hours apparently elapsed between the time of his ejection and the time of the injury. There is no evidence to support the finding of the trial court that the train which injured the plaintiff was negligently operated and the district court of appeal based its judgment upon the original negligence in ejecting the plaintiff from its train. Assuming without deciding that the defendant was negligent in ejecting the plaintiff from its train in the condition in which he then was, the question is, Was such negligence the proximate cause of plaintiff's injuries? It appears from the testimony of the conductor that however dangerous the point of his ejection may have been, plaintiff immediately left the tracks of the defendant railway and entered a ditch. If he had remained there he would have been uninjured. The fact that he was later injured at a point three-quarters of a mile away upon the tracks of the defendant railway is of no significance in determining whether or not the defendant was negligent in ejecting the plaintiff from its train. If the plaintiff had wandered north and been injured by a Southern Pacific railway company's train or had succeeded in getting on one of the numerous streets and highways in the vicinity and been injured by a passing automobile, it would hardly be contended that the injury was the proximate result of the ejection.

The only connection between the ejection and the injury would be the fact that if there had been no ejection there would have been no injury. The sale of the whisky to the plaintiff would come nearer being a proximate cause of the injury than the ejection from the railway train. The peril arising from the ejection ceased the moment the passenger left the position where he could be struck by defendant's trains, while the peril arising from the use of the intoxicating liquor continued in operation up to the time of the injury and contributed thereto, and yet it has been uniformly held in the absence of statute to the contrary that the sale of intoxicating liquor is not the proximate cause of injuries subsequently received by the purchaser because of his intoxication. (Joyce on Intoxicating Liquors, sec. 421; *Cruse* v. *Aden*, 127 Ill. 231, 234, [3 L. R. A. 327, 20 N. E. 73].)

[1] There is no more reason for holding the defendant liable for the injury in this case than there would be had the plaintiff wandered into some neighboring yard and been shot as a burglar. In each case the injury would have been avoided had there been no ejection of the plaintiff from the defendant's train, but in each case the ejection is obviously not the proximate cause. In determining the responsibility of the defendant it must be recollected that the plaintiff, no matter how badly intoxicated he was, was entitled to go wherever he pleased and that the agents of the defendant had no authority to exercise any restraint whatever over his person. His ability to leave the scene of the ejection is demonstrated by the fact that his injuries occurred three-quarters of a mile away. That the injury was not the proximate result of the ejection is demonstrated by the fact that the plaintiff was able to, and did in fact, leave the place of danger and subsequently of his own volition returned to a position of danger on defendant's tracks, and that but for plaintiff's action in so returning to a position of danger the accident would not have occurred.

It is unnecessary to discuss the numerous cases cited by the parties in their briefs upon the question of proximate cause. Under somewhat similar facts of injuries to intoxicated persons who had been ejected from passenger trains the courts have held that the injuries under the particular circumstances of the cases were not the proximate result of the ejection. (*Hamilton* v. *Pittsburg etc. R. R. Co.*, 183 Pa. St. 638, [38 Atl. 1085]; *State* v. *Washington, B. & A. Electric R. Co.*, 130 Md. 603, [101 Atl. 546]; *Kradel* v. *Pittsburg, H. B. & N. C. Ry. Co.*, 255 Pa. St. 427, [100 Atl. 128].)

The following cases are cited on behalf of respondent: *Doherty* v. *California N. & I. Co.*, 6 Cal. App. 131, [91 Pac. 419]; *Cincinnati, N. O. & T. P. Ry. Co.* v. *Marrs' Admx.*, 119 Ky. 954, [115 Am. St. Rep. 289, 70 L. R. A. 291, 85 S. W. 188]; *Louisville & Nashville R. R. Co.* v. *Johnson*, 108 Ala. 62, [31 L. R. A. 372, 19 South. 51]; *Fagg's Admr.* v. *Louisville & N. R. R. Co.*, 111 Ky. 30, [54 L. R. A. 919, 63 S. W. 580]; *Haug* v. *Great Northern Ry. Co.*, 8 N. D. 23, [73 Am. St. Rep. 727, 42 L. R. A. 664, 77 N. W. 97], and *Roseman* v. *Carolina Cent. R. R. Co.*, 112 N. C. 709, [34 Am. St. Rep. 524, 19 L. R. A. 327, 16

S. E. 766], but they are so clearly distinguishable on the facts that we deem it unnecessary to discuss them.

Judgment reversed.

Olney, J., Sloane, J., Shaw, J., Lennon, J., Angellotti, C. J., and Lawlor, J., concurred.

Rehearing denied.

All the Justices concurred, except Wilbur, J., who was absent.