[Civ. No. 356.   Fourth Appellate District.—March 28, 1931.]

JOHN G. MONTIJO, Appellant, v. SAMUEL GOLDWYN, INC., OF CALIFORNIA, Respondent.

George C. Spicer and Elliott H. Barrett for Appellant.

Loeb, Walker & Loeb for Respondent.

MARKS, J.—In 1925 appellant was the owner of a four-passenger cabin airplane of the biplane type. Respondent was engaged in producing moving pictures. In the fall of 1925 respondent was filming a picture known as "Partners Again", one of a "Potash and Perlmutter" series. The plot of the story included an act which involved an airplane and an automobile rushing toward each other at rapid speeds with the airplane avoiding a collision by zooming over the automobile and just missing it. This was characterized as a "stunt" which was intended to give a "thrill" to an audience by the apparent and actual danger to those participating in it.

Respondent engaged appellant to use his airplane in this stunt for a compensation of $100 per day, or $50 an hour if the airplane was out of its hangar for more than two hours on any one day.

Ray Cushman was the owner of a Cadillac automobile of the touring car type. It was generally used for the purpose of transporting moving picture actors and properties from studios to places where scenes were filmed. Samuel Diege conducted an auto rental service in Hollywood under the name of "Sammy's Rental Service". He furnished automobiles and drivers to moving picture producers for like transportation purposes. Other than his own automobile, which he occasionally used and drove, he did not own any of the cars working out of his agency, but acted as agent in obtaining business for other owners, such as Cushman, taking ten per cent of the charges for his services.

November 20, 1925, was fixed by respondent for filming the "stunt" in "Partners Again". Respondent arranged with Samuel Diege to have three automobiles report at its studio in Hollywood to transport the actors and necessary properties to the Municipal Airport at Long Beach. Ray Cushman, Jack Radke and another driver were assigned to this undertaking by Diege. They reported at the studios of respondent on the morning of November 20th and took

the paraphernalia and actors to the airport where appellant was waiting.

Jack Radke was an automobile racing and stunt driver of considerable skill and large experience. He had participated in many dangerous stunts in moving pictures, such as turning his automobile over at high rates of speed, engaging in collisions with other automobiles, and in crossing railroad tracks in front of fast-moving trains in such close proximity to the front of the train that his tail-light would appear to be torn off. He was selected to drive the ''stunt'' automobile over which the airplane was expected to zoom. In this automobile was seated Radke, dressed in a policeman's uniform, an actor also dressed as a policeman, and perhaps two others. The cameras were placed in the tonneau of a second automobile, which, during the first two trials of the stunt was driven by an undisclosed person. The camera car was to follow Radke's car at a distance of twenty-five feet, the cameras photographing the airplane approaching the Radke car and zooming over it.

Cullen Tate was the director in charge of filming this stunt for respondent. He was working under Robert B. McIntyre who was its production manager. Prior to the twentieth day of November McIntyre had explained the details of the story to appellant and had discussed the necessary action with him. On the morning of November 20th, Tate, appellant, Radke, and respondent's head cameraman, together with others, conferred over the details of the stunt. Appellant said that the flying speed of the airplane was between sixty-five and seventy miles per hour and that he would require from 1000 to 1200 feet in which to attain this speed so that he could zoom over the automobile. The runway at the airport was 1950 feet long. He directed the stunt automobile to start after the airplane had started and to proceed at a speed of between thirty and thirty-five miles per hour which would give him the required two-thirds distance of the runway over which to travel before meeting the automobile. It was arranged that when the actors and the cameramen were ready, Tate would signal this fact to appellant by waving a white handkerchief and appellant would then start his airplane and the action would proceed.

On this day the airplane took its position at the west end of the runway facing east, and the automobiles at the east end of the runway facing west. There was a very gentle breeze blowing from the east to the west of the airport. When the cameramen and actors were in their places and ready to perform their duties, Tate gave appellant the agreed signal and he started his airplane on its course. The automobiles started immediately afterward and the machines proceeded toward each other at the respective speeds and in the position and manners as arranged by appellant. When the leading automobile was within about 100 feet of the oncoming airplane, Radke lost his nerve, and thinking that a collision could not be avoided threw his car to the right and passed out of the picture. The airplane successfully zoomed over the place where the stunt automobile should have been. The action of the picture having been spoiled by Radke, it was necessary to take the scene over again. All of the participants proceeded as before and the airplane successfully zoomed over the automobile clearing its top by a very few feet. However the driver of the camera car on this trial swerved his car so that the stunt automobile and the airplane passed out of the field of the cameras and it had to be again retaken. On the third attempt Tate changed the driver of the camera car and put Ray Cushman at the wheel. The third filming of the stunt was a success though the airplane passed closer to the top of the leading automobile than on the second occasion. Tate desired to refilm the scene to insure a good picture and directed the action repeated. On the fourth attempt all of the participants executed their parts in accordance with the previous plan. On this occasion the airplane barely cleared the top of the stunt automobile thus by only a few inches avoiding a serious collision. This ended the filming of the scene for that day.

The films were developed and run in respondent's projection room before Samuel Goldwyn, McIntyre, Tate and others. They were not satisfied with the picture for the reason that the cameras, as placed in the second car, were too far from the airplane to give the audience a good idea of the action of the automobile and the airplane rushing toward each other at rapid speeds and the airplane avoiding the collision by starting to zoom over the automobile at about

a hundred feet or less in front of it and just clearing its top. For this reason the ''thrill'', caused by the very evident danger to the occupants of the two machines, was lost to the audience. The representatives of respondent decided to retake the picture and place the cameras in the tonneau of the stunt automobile rather than in a second car. The filming of this scene was fixed for December 1, 1925, and appellant was told to have his airplane in readiness at the Long Beach airport. Samuel Diege again furnished the automobiles and drivers to transport the actors and properties. He went, driving his own car. Ray Cushman again reported for duty. The driver of the third automobile on this occasion is not identified in the record. When the drivers of the automobiles appeared at the studio on the morning of December 1st, Jack Radke could not be found and Cushman was asked if he would drive the stunt automobile for an added compensation of $25. He agreed to do this and was sent to the property room for a policeman's hat and coat. The cameras were lashed in the tonneau of Cushman's car and the party proceeded to the airport. There they met appellant and briefly went over the details of the stunt. As the wind was blowing from the southwest appellant chose his position at the east end of the field and that of the automobile at the west end. The day was cloudy and the filming of the stunt was delayed during which time the participants had their lunch. After lunch the airplane taxied to its position and the automobile took its position at the other end of the runway. As the light was still poor the action had to be still further delayed and the engine of the airplane was stopped for between twenty and forty minutes before it was again started. When the light became better Tate waved to appellant who thereupon started his engine. The automobile was started and the two machines rushed toward each other. For some reason the stunt did not work as planned, the automobile and airplane coming into collision a short distance west of the center of the field. The left wheel of the airplane struck the radiator of the automobile between a foot and a half and two feet above the ground. This wheel was torn off as well as the lower left wing of the airplane. The balance of the airplane cleared the automobile and rose over some wires at the end of the field when it settled and crashed

into a brick wall seriously damaging it. Appellant and his companion escaped without any serious injuries.

Appellant instituted this action to recover for the damages to his airplane and the loss of its use following the accident. After the close of the evidence the trial court gave a peremptory instruction to the jury to return a verdict in favor of respondent. Appellant appealed from the judgment which was entered upon this verdict. He maintains that the accident was caused by the negligence of Cushman in driving the automobile at a speed in excess of thirty-five miles per hour so that it traveled more than one-third of the length of the runway and did not give the airplane sufficient space in which to attain its flying speed of from sixty-five to seventy miles per hour so that it could successfully zoom over the automobile. There is evidence in the record to the effect that the automobile traveled at least forty miles per hour.

A careful examination of the lengthy transcript would suggest either one, or all, of three explanations for the collision. First, that the airplane engine cooled off during the wait and therefore could not develop sufficient power to attain its flying speed before reaching the point where it had to zoom over the automobile. Second, that the automobile traveled at too high a rate of speed therefore not giving the airplane sufficient space in which to attain its flying speed. Third, that atmospheric conditions were different from those on November 20th on account of the clouds and the different heat and density of the air. Any one or all of these conditions might have been contributing factors to the accident.

We have carefully examined the record and have concluded that in performing his part of the stunt appellant was acting as an independent contractor. The airplane belonged to him and its management, operation and control were left to him. Neither McIntyre nor Tate knew anything about its operation. Before he was engaged by them he was told the results they wished to accomplish and he in turn told them what he would require in performing it. He specified the distance his airplane would have to travel before it could attain flying speed sufficient to zoom over the automobile. He knew the length of the runway at the airport and specified the maximum speed at which the auto-

mobile should travel and that it was not to start until after the airplane had started. It clearly appears from the evidence that respondent and its representatives were only interested in the results to be attained by the stunt and that the means whereby this result was to be accomplished were left entirely to appellant. The representatives of respondent exercised no control over either the planning of the details of the stunt or the manner in which it was to be executed, which rendered appellant an independent contractor. (*Green* v. *Soule,* 145 Cal. 96 [78 Pac. 337].) It is true that Tate gave appellant a signal before the stunt started. This signal merely informed him that the cameramen were ready to film the action and can in no manner be construed as control over the details of the operation of either the automobile or the airplane.

The evidence strongly indicates that Ray Cushman was acting as an independent contractor and not as an employee of respondent on December 1, 1925. His employment divided itself into two separate contracts. First, he was employed through Samuel Diege to transport actors and materials from respondent's studio to the airport. He did this in his own automobile without supervision by respondent except as to the time of departure and the place of arrival. The manner of the operation of his automobile during the trip, together with the route to be taken, were left entirely to him. In this part of his employment there can be no question but that he was acting as an independent contractor. (*Fidelity & Casualty Co.* v. *Industrial Acc. Com.,* 191 Cal. 404 [43 A. L. R. 1304, 216 Pac 578]; *Stephens* v. *Industrial Acc. Com.,* 191 Cal. 261 [215 Pac. 1025].) His second contract of employment on December 1st, was the driving of his automobile in the stunt for which he received $25 from respondent. He had been present during the four trials held on November 20th, and had driven his automobile in two of these trials. He had also heard appellant give Radke instructions as to the operation of the automobile. It is true that on the day of the accident Tate told him to drive his automobile between thirty and thirty-five miles per hour after the airplane started. In doing this Tate merely repeated the former instructions given by appellant to Radke which probably had been heard by Cushman. As far as the record discloses

the agents of respondent did not plan any of the details of the operation of either the airplane or the automobile during the filming of the stunt. This was done by appellant.

That the stunt was inherently dangerous appears from the testimony of all of the participants in it as well as that of other aviators called as witnesses. Appellant recognized this danger in his first negotiations with McIntyre. He asked that respondent assume the risk for any damage done the airplane, which respondent did not do. When the success or failure of an undertaking of this kind depends, first, upon the elements of nature, second, upon the operation of highly intricate machines such an an airplane and an automobile, and, third, upon inconstant human factors controlling the exactness and precision of the operation of these machines, and when a change in any one of these three things might result in serious consequences it would be apparent to anyone that a collision with consequent damage and injury would almost surely result from the frequent repetition of the act. Just when this injury would come would depend upon the failure of one of these three factors to function properly and with the exact precision that the success of the maneuver required. Neither appellant nor anyone else could reasonably expect exact precision in the operation of each of the three elements on repeated occasions. The fact that the accident did not occur during one of the four trials on November 20th could be attributed more to good luck than to any other cause. In making his contract with respondent appellant should and probably did take these risks into consideration and fix his compensation at a sum commensurate with them. He should be held to have assumed the risks of damage to his airplane which were incident to his contract.

Negligence is defined as an absence of ordinary care (sec. 1714, Civ. Code); as the omission to do something which a reasonably prudent man would do, or the doing of something which a reasonably prudent man would not do in the conduct of his affairs. (*Jamison* v. *San Jose etc. Co.*, 55 Cal. 593.) The statement of these rules and their application to the facts of this case immediately leads us to the conclusion that appellant must be charged with negligence in undertaking and carrying out the dangerous stunt in

which he participated on November 20th and on December 1, 1925. We do not believe that an aviator exercising ordinary prudence and care would engage in an undertaking of this kind without the reasonable expectation of incurring serious injury to himself and his airplane. The very dangerous nature of the stunt makes the probability of such injuries imminent and because of the probability of an accident following the undertaking the fact of participating in it must be considered as the proximate cause of the ensuing damages. If the negligence of appellant was the proximate cause of the consequent damages he cannot recover. (*Lammers* v. *Pacific Elec. Ry. Co.*, 186 Cal. 379 [199 Pac. 523].)

"Contributory negligence has been defined as 'such an act or omission on the part of the plaintiff amounting to a want of ordinary care, as, concurring or co-operating with the negligent act of the defendant, is the proximate cause of the injury complained of'. Merely because one person is at fault does not dispense with the duty of another to use ordinary care, so that if a plaintiff—other than an employee in an action against his employer—is guilty of contributory negligence as above defined, he may not recover." (19 Cal. Jur. 644.)

If we assume that Ray Cushman was an employee of respondent in driving the automobile during the stunt on December 1, 1925, and not an independent contractor, and that as such an employee he was negligent in driving the automobile at a speed of more than thirty-five miles per hour, still we must hold that the negligence of appellant in participating in such a dangerous undertaking contributed to the accident and consequently barred his recovery.

Judgment affirmed.

Barnard, P. J., and Jennings, J., concurred.