[Civ. No. 25488. Second Dist., Div. Two. Mar. 27, 1962.]

ALPHONSO WOODALL, Plaintiff and Respondent, v. WAYNE STEFFNER PRODUCTIONS, INC., et al., Defendants and Appellants.

James D. Garibaldi, Warren J. Lane and Abe Mutchnik for Defendants and Appellants.

I. Warren Rainer and Edward L. Lascher for Plaintiff and Respondent.

ASHBURN, J.—Defendants Wayne Steffner Productions, Inc., and Jerome Welo[1] appeal from judgment for plaintiff based on a verdict for $135,000 which was reduced to $70,000 on motion for new trial. The action is one for damages for personal injuries.

Plaintiff had a stunt in which he was lifted over water while suspended by and sitting on the framework of a kite which he had constructed. This he had done often. In March 1959, he made a deal with defendant corporation to come from his Cleveland home to the Los Angeles area and for a consideration of $500 to do the same act, known as ''The Human Kite,'' over land, being drawn by an automobile instead of a boat. It was to be a sequence for a television production entitled ''You Asked For It.'' Briefly, the setup was this: He stood on roller skates with the kite in position, it was tied to the rear axle of an automobile by a 150 foot rope; the auto was to start slowly and increase its speed to 27-30 miles an hour, at which time the kite would take to the air with plaintiff sitting in it. His experience had been such that he was able to control all features of the flight except forward speed; on that he had to rely on the operator of the boat or automobile; it was imperative that the speed be reduced as soon as the kite became airborne; the object of this is to stop the

---

[1]Said defendant's name is misspelled ''Wheelo'' throughout the reporter's transcript.

upward climb, when that happens the kite goes forward and can be maneuvered successfully; if the take-off speed is maintained the wind in the back will override the forward speed and cause the kite to dive. Plaintiff further explained: "Once the kite gets up in her flying position, whether it is 50 feet, 75 feet or 100 feet, wherever the kite levels off in this position here (indicating) which is her regular flight position, . . . say a gust of wind come along, or the car has a tendency to be two miles over the speed, I can rock up on my bars here and bring the kite into the wind and that automatically creates a brake on the kite, it automatically will slow down the automobile to bring it down to the given speed. In speed boats with 30 horsepower motors I can rock on the kite and bring the boat almost to a standstill just by braking the kite into the wind." But, when 75 feet up in the air "if you don't make a perfect flight it is curtains." Though plaintiff had made but one exhibition flight over land, he had found in 10 or 11 trial flights that the land job was steadier than the one over water. He had one expert driver whom he used for the land flight, one Mannyings. When making the deal with Mr. Chamberlin (television producer for defendant corporation) plaintiff said his main requirement in a driver was that he had been on stunts of that nature before. Asked if it was absolutely necessary for his own driver to come to California he said, "I knew my kite and I could take care of the kite if the man on the ground will listen to instructions, if he was a qualified driver. So at that he said 'We have one of the best stunt drivers in Hollywood,' . . . in fact better than my drivers back in Cleveland and I said 'Well, in that case, it would be all right to use your drivers.' . . . Q. Was there any discussion in the second conversation again about the qualifications of the driver? A. Yes, we went over that again and he had contacted the drivers that would be used on the program and again he assured me, I reminded him that the man would have to be a top qualified driver and able to listen to orders when given to him, and what not to do. Q. He again assured you, you say? A. Yes." Likewise, Don Henderson (defendant's[2] director-cameraman) "assured me that the drivers they had were qualified drivers." So plaintiff left his own driver at home.

Soon after his arrival in Los Angeles on March 22, 1959, one Hochman drove plaintiff from his hotel to the drag strip

---

[2]The word "defendant" as used herein will refer to Wayne Steffner Productions, Inc., unless otherwise indicated.

where the stunt was to be put on. Hochman said he was to be plaintiff's driver but when plaintiff discovered he had been driving with his emergency brake partially on he refused to have Hochman. So Welo was assigned by defendant to drive in the exhibition flight. Plaintiff gave Welo explicit and repeated instructions as to speed, signals, etc., and Welo was told to slow the car after reaching a speed of 27-30 miles; he agreed to do so. Plaintiff's last word to Welo before the flight was, "Remember, now, don't go over 30 miles an hour," to which Welo agreed. Welo himself testified by deposition: "I have never represented myself to Mr. Woodall or anybody else as being a driver because I am not." In fact Welo never held himself out to Henderson as a stunt driver, had never been used as such by defendant, but had been assigned to this stunt notwithstanding the assurances previously given to plaintiff.

On the occasion in question, according to plaintiff, Welo started too slowly, was given a signal to go faster and was supposed to accelerate at once; the kite jumped along and did not take off; then Welo gave a quick surge forward and the kite rocketed up. Plaintiff started giving the wave-off signal (for an emergency stop); the kite reversed itself, but plaintiff still felt a forward motion, the kite began to fall and he could no longer control it. They were jerked along the ground and plaintiff could feel the rope taut and could feel the forward motion. His estimate was that the car got up to 45 miles.

Welo testified: "Q. Do you recall anything that Mr. Woodall told you with respect to the importance of slowing down after a certain point when he took to the air? A. Yes, I know all that. Q. You know all that? A. Yes. Q. You accelerated, though, is that correct? A. No, I did not. Q. Well, did you slow down when he got into the air? A. Did I slow down? Q. Did you slow the speed of the car down when he got in the air? A. I stopped immediately. Q. How far into the air did he get then? A. I would say 70, 75, maybe 80 feet. I am not sure. Q. While he was getting 70, 75 or 80 feet in the air, during that period from the time he left the ground until he got 75 feet in the air, did you slow down any before you made an immediate stop? A. Look, fellow. There wasn't time, it happened so fast." "I said we had a prearranged signal but it happened so fast that I never got the signal. Q. Then you didn't see any signal; is that right? A. That is right." "Q. You were the driver on that day, weren't you? A. I was the

driver, if you want to call it that, but I am looking backwards and he [Carlson] is watching the speedometer and everything else. Q. Who is holding the wheel? A. Pardon? Q. Who is holding the wheel? A. I don't remember."

The kite turned over on plaintiff and he was seriously injured. He began to yell, "Too fast, too fast, I told him too fast." A boy who was about five feet from plaintiff when on the ground heard him, less than a minute after the accident, repeating, "I told him not to go too fast." Welo said the car got up to 33-34 miles. Kenneth Carlson, who was in the tow car with Welo assigned to the job of watching the speedometer, testified that when plaintiff was lying on the ground he heard him say, "Too fast" and "My leg, my leg."

An expert witness, William D. Bridgeman, who viewed the film of this unfortunate flight and made computations based thereon, testified that "speed was the cause of the accident"; also, "Speed caused it to come down, that is right." Another expert, Sergeant Donald M. MacLean, of the Los Angeles Police Department, upon the basis of like calculations expressed the opinion that the speed of the tow car got up to 46.5 miles an hour.

In the foregoing statement and upon other factual issues we have accepted as proved all evidence and inferences favorable to respondent which find substantial support in the evidence, for this we are required to do. (*Crawford* v. *Southern Pacific Co.*, 3 Cal.2d 427, 429 [45 P.2d 183]; *Nichols* v. *Mitchell*, 32 Cal.2d 598, 600 [197 P.2d 550]; *New* v. *New*, 148 Cal. App.2d 372, 383 [306 P.2d 987].)

■■ Appellants do not challenge the amount of the verdict as reduced. Their first point is that there was no substantial evidence that appellants were negligent or that negligence of appellants, if any, was a proximate cause of plaintiff's injuries. The foregoing statement of facts seems to answer this contention sufficiently. Actually the burden of the argument is that this was an inherently hazardous stunt and one who engaged in it was negligent as a matter of law or assumed any risks involved in it.

Reliance is placed on *Montijo* v. *Samuel Goldwyn, Inc.*, 113 Cal.App. 57 [297 P. 949], which does lend considerable apparent support to appellants' position. The cardinal facts are stated at page 58: "In the fall of 1925 respondent was filming a picture known as 'Partners Again,' one of a 'Potash and Perlmutter' series. The plot of the story included an act which involved an airplane and an automobile rushing toward

each other at rapid speeds with the airplane avoiding a colli-
sion by zooming over the automobile and just missing it. This
was characterized as a 'stunt' which was intended to give a
'thrill' to an audience by the apparent and actual danger to
those participating in it''; and page 61: ''For some reason
the stunt did not work as planned, the automobile and air-
plane coming into collision a short distance west of the center
of the field. The left wheel of the airplane struck the radiator
of the automobile between a foot and a half and two feet
above the ground. This wheel was torn off as well as the lower
left wing of the airplane. The balance of the airplane cleared
the automobile and rose over some wires at the end of the field
when it settled and crashed into a brick wall seriously damag-
ing it.'' At page 64: ''That the stunt was inherently danger-
ous appears from the testimony of all of the participants in
it as well as that of other aviators called as witnesses. . . .
When the success or failure of an undertaking of this kind
depends, first, upon the elements of nature, second, upon the
operation of highly intricate machines such *an* an airplane and
an automobile, and, third, upon inconstant human factors
controlling the exactness and precision of the operation of
these machines, and when a change in any one of these three
things might result in serious consequences it would be appar-
ent to anyone that a collision with consequent damage and
injury would almost surely result from the frequent repetition
of the act. Just when this injury would come would depend
upon the failure of one of these three factors to function
properly and with the exact precision that the success of the
maneuver required. Neither appellant nor anyone else could
reasonably expect exact precision in the operation of each of
the three elements on repeated occasions. The fact that the
accident did not occur during one of the four trials on No-
vember 20th could be attributed more to good luck than to
any other cause. In making his contract with respondent
appellant should and probably did take these risks into con-
sideration and fix his compensation at a sum commensurate
with them. He should be held to have assumed the risks of
damage to his airplane which were incident to his contract.''

This case has no tendency to support the claim that appel-
lants herein were not negligent. At best it argues for assump-
tion of risk, and the argument of appellants really merges
into the claim of assumption of risk, later considered and re-
jected herein.

■ Before leaving the question of defendant's negligence it should be observed that the pretrial conference order (which incorporates the joint pretrial statement of counsel) states one of the issues to be: "Plaintiff contends that Defendants contrary to their representation to Plaintiff that he would be furnished with a 'qualified and experienced stunt driver' instead negligently, and carelessly utilized the services of a co-Defendant JEROME WHEELO who was known by said Defendants to be completely devoid of any qualifications or experience as a stunt driver, but was in truth and fact hired as and being paid as a studio grippe." The evidence amply supports the view that the managing officers of defendant were negligent in selecting and assigning Welo as the driver of the tow car on the occasion of the accident. 57 Corpus Juris Secondum section 566, page 290, says: "*Negligence in furnishing incompetent servant.* The doctrine of loaned servant relieves the general master from liability for the servant's negligence only, and does not relieve the general master from liability for his own negligence in knowingly furnishing an incompetent servant." See also *Evans* v. *Raney*, 14 Tenn. App. 668, 671-672; *Pearson* v. *Arlington Dock Co.*, 111 Wash. 14 [189 P. 559, 561]. Even if it were to be held, as argued by defendant corporation, that Welo was its general servant and loaned to plaintiff by defendant, this principle would preclude exoneration of defendant corporation from liability to plaintiff.

■ Appellants argue that Welo was an independent contractor and his negligence not imputable to appellants. In support of this they rely primarily upon the following passage from the Welo testimony: "Q. Were you an employee or were you an independent contractor, let's put it that way? A. I was an independent contractor." A rank conclusion with respect to a mixed question of law and fact. But there was no objection, no motion to strike, and the evidence is in the record and must be considered for what it is worth. (Cf. *Estate of Moore*, 143 Cal.App.2d 64, 74 [300 P.2d 110]; *Berry* v. *Chrome Crankshaft Co.*, 159 Cal.App.2d 549, 552 [324 P.2d 70].) There is a presumption that one engaged in doing another's work is his employee. (*Robinson* v. *George*, 16 Cal.2d 238, 242 [105 P.2d 914]; *Pierson* v. *Holly Sugar Corp.*, 107 Cal.App.2d 298, 301 [237 P.2d 28]; *Dibble* v. *San Joaquin L. & P. Corp.*, 47 Cal.App. 112, 115 [190 P. 198]; *Alford* v. *Bello*, 130 Cal.App.2d 291, 295 [278 P.2d 962].) Moreover, there is substantial evidence that points to the

single conclusion that Welo was the general employee of defendant.

Appellants' counsel make a secondary argument that Welo had been loaned to plaintiff Woodall (stated in the pretrial order to be an independent contractor), had become his special employee *pro hac vice* and hence his negligence was imputable to plaintiff and not to defendant. Counsel invoke the general rule thus stated in *Burns* v. *Jackson,* 53 Cal.App. 345, 350 [200 P. 80]: " 'It is accordingly well settled that one who is the general servant of another may be loaned or hired by the master for some special service so as to become as to that service the servant of such third party; and where a general servant is so loaned or hired to another, and as regards the particular service for which he is so loaned or hired is subject wholly to the direction and control of that other, the latter, and not the general employer, is the master so far as the particular service is concerned and liable for injuries caused by the negligence and wrongful act of the servant while engaged in the duties pertaining to such service.' " But that well settled rule is not applicable to the facts here presented.

The project was that of defendant. It was in the business of filming "acts of skill and daring" as a part of its television show known as "You Asked For It." For this occasion it had in operation a tow car to haul the kite, a camera car to parallel the flight and take pictures as it progressed, a helicopter to view and photograph it from above, and a crew of some six men, viz., Welo to drive the tow car, Carlson with him to watch the speedometer so Welo could keep his eyes on plaintiff and his signals; Hochman driving the camera car and Crabe taking pictures; Jack Smith and Don Henderson in the helicopter. Henderson was director and, as he phrased it, "responsible for the production crew, the cameraman and so on. . . . 'You Asked For It,' when we are photographing an act such as we have done hundreds of times, the director is responsible for getting the act as it is presented onto film. . . . My job as director was to find out what was going to be done as the act was presented and plan the camera placement, who would work on it, and so on. This was the job of the director and in this case I was in charge of our crew."

Plaintiff had been hired to fly the kite and ride in it. Before a flat price of $500 was reached the negotiations had

involved defendant's paying certain expenses of plaintiff. Defendant was operating on a tight budget and raised the question whether it would be absolutely necessary for plaintiff to bring his own expert driver from Cleveland. Mr. Chamberlin, the television producer of "You Asked For It," "knew full well how important each person [is] in such a feat." Henderson, the director, testified that in an operation like that one they "required specialists, people that had broad experience and a variety of talents." Also that he knew plaintiff and the tow car driver would operate through signals and "I made clear everybody knew what was going to happen." So Chamberlin assured plaintiff that defendant had "people here that could do this just as well as any man he had and, in fact, better." Henderson understood that plaintiff "wanted a man that could follow instructions, that was level headed, that would not get excited or make rash decisions yet would act quickly and, I think, level headed is the word that perhaps gives the substance of the conversation." So he gave substantially the same assurances as Chamberlin had done. Plaintiff agreed to and did leave his expert driver at home and relied upon defendant to furnish him such an expert. Plainly, it was understood that the driver must be a skilled one because his performance would control the danger aspect of the exhibition. So the activities were divided between plaintiff and defendant but the over-all exhibition remained defendant's routine business. Henderson testified: "Q. You knew the person who was driving the car would have to follow certain instructions, did you not? A. Yes. Q. You knew that those instructions could be very important to the man up in the air? A. Yes. Q. Did you yourself make any effort to insist on knowing what those instructions were, as the director, did you say 'I want to know what you guys are up to'? A. I did not insist on knowing the signals. I insisted on the driver knowing the signals. Q. You did insist on the driver knowing the signals? A. I made sure the driver knew the signals. I asked the driver. Q. Why did you do that? A. I felt it was important they did know the signals."

There was in no sense a lending of Welo to plaintiff. True, he was to accept instructions from plaintiff and operate according to signals given by him, but that was nothing more nor less than cooperation between two experts in the safe conduct of the exhibition. Welo was in fact the general employee of defendant, a small organization in which every-

body would switch activity from time to time as the occasions demanded. He was paid by the hour for his work, not the job, and the employer deducted from his pay items representing income tax, social security and unemployment insurance. He was assigned to this particular job by Henderson who was in charge of the filming of the flight, and was paid just as on other jobs. In the car with him was Carlson assigned to watching the speedometer; in the crew which was participating in the conducting and filming of the flight was also one Crabe; both of these men looked upon Welo as one authorized to give them instructions.

The flight could not be made successfully except at certain regulated speeds of the tow car and upon signals given from the air to the ground. Plaintiff had the right to reject Welo as driver before the flight began but there was no possibility of his discharging him after the start was made.

While there was in fact no lending of defendant's servant Welo to plaintiff, the reasoning of the authorities dealing with a lending in somewhat similar circumstances is helpful. Where the servants of two employers are jointly engaged in a work of mutual interest, each employee remains the servant of his own master and does not become the servant of the other. *Moss* v. *Chronicle Pub. Co.*, 201 Cal. 610, 613 [258 P. 88, 55 A.L.R. 1258] : ''Certain it is that appellant [Chronicle Publishing Company] was so vitally interested in the dispatch of the work that the jury could have found that appellant's servant and Mowry's servant were at the time of the accident jointly engaged in a work of mutual interest to the parties, and this is true even if it be conceded that Miotti, after being ordered to this service, thereafter took his orders as to the details thereof from the servant of Mowry. It is a well-recognized principle that where the servants of two parties are jointly engaged in a work of mutual interest each employee is the servant of his own master and neither of the employees is the servant of the other's master.'' If plaintiff were the employee of some Cleveland firm that had sent him to California to conduct this exhibition these authorities would be precisely applicable. We do not see that the fact that plaintiff is acting as a principal affects Welo's status under such circumstances.

Moreover, ''it is necessary to distinguish between authoritative direction and control and mere suggestions as to details or the necessary co-operation where the work furnished is part of a larger operation.'' (57 C.J.S. § 566, p. 287.) On this

subject the *Moss* case, *supra*, says at page 616: "Again, quoting from 39 Corpus Juris, section 1462, page 1275: 'To escape liability the original master must resign full control of the servant for the time being, it not being sufficient that the servant is partially under the control of a third person; and it is necessary to distinguish between authoritative direction and control and mere suggestions as to details or the necessary co-operation where the work furnished is part of a larger operation.'

"A familiar illustration of the lack of full control is found in the case of *Chamberlain* v. *Lee,* 148 Tenn. 637 [257 S.W. 415, 417]. There the servant of an independent contractor went to the building of another master to repair the elevator. There the operator of the elevator, the servant of the owners of the building, was told to operate the cage in such way and manner as he might be directed by the servant of the independent contractor. In manipulating the elevator, the latter servant was injured. The owners of the building were held liable upon the ground that, although their servant was directed to place himself for certain purposes under the control of the independent contractor, nevertheless their control over said servant was not completely resigned, and the cause of action by the employee of the independent contractor against them was sustained, the court saying:

" 'This does not make out a case of lending a servant. The servant was put under the control of plaintiff for one purpose alone. That is, to move the car up and down as plaintiff desired while the particular job was being done. The elevator car was put under the control of the plaintiff for the time, but it was put under his control along with its attendant, who remained in the service of the defendants. There is nothing to show that plaintiff could have discharged this boy, and put another boy to running the elevator at this time. Plaintiff certainly had no right to use this elevator boy for any purpose in connection with the work other than running the elevator up and down. The plaintiff could not have required the elevator boy to remain on duty for a longer period than his regular hours under his contract with defendants.

" 'In order to escape responsibility for the negligence of his servant on the theory that the servant has been loaned, the original master must resign full control of the servant for the time being.' " To the same effect are, *Peters* v. *United Studios, Inc.,* 98 Cal.App. 373, 379 [277 P. 156]; *Valdick* v. *LeClair,* 106 Cal.App. 489, 496 [289 P. 673]; *Carlson* v. *Sun-*

*Maid Raisin Growers Assn.,* 121 Cal.App. 719, 728-729 [9 P.2d 546]; *Welborn* v. *Dalzell Rigging Co.,* 181 Cal.App.2d 268, 275 [5 Cal.Rptr. 195]; *Doty* v. *Lacey,* 114 Cal.App.2d 73, 78 [249 P.2d 550]; *Standard Oil Co.* v. *Anderson,* 212 U.S. 215, 226 [29 S.Ct. 252, 53 L.Ed. 480, 485]. As indicated by Henderson's testimony quoted above there was not complete relinquishment by defendant of control over Welo.

 ▮ Giving of directions as to the details of the work and manner of doing it or giving of signals by plaintiff to Welo does not convert the latter into an employee of the former. (*Doty* v. *Lacey, supra,* 114 Cal.App.2d 73, 79; *Moss* v. *Chronicle Pub. Co. supra,* 201 Cal. 610, 615; *Entremont* v. *Whitsell,* 13 Cal.2d 290, 296 [89 P.2d 392]; 57 C.J.S. § 566, p. 288.) The fact that the servant furnished by the general employer was an expert (or furnished as such) is also significant. (*Halliburton Oil Well Cementing Co.* v. *Paulk* (5 Cir.), 180 F.2d 79, 83; *Doty* v. *Lacey, supra,* p. 78; 1 Rest., Agency 2d, § 227, p. 501; *McComas* v. *Al. G. Barnes Shows Co.,* 215 Cal. 685, 693, 696 [12 P.2d 630].) The fact that the plaintiff, if dissatisfied with Welo, could have procured another driver before the flight began cannot control the result. (32 Cal. Jur.2d § 114, p. 548; *Radich* v. *United States* (9 Cir.), 160 F.2d 616, 618; see also, *California Emp. Stab. Com.* v. *Morris,* 28 Cal.2d 812, 819 [172 P.2d 497].)

 Under the facts of this case the court correctly concluded as matter of law that Welo did not become or act as plaintiff's servant, employee or agent,—that is to say, such is the correct conclusion except as affected by the conclusionary evidence received without objection to the effect that Welo was an independent contractor. True, that statement created an attenuated conflict in the evidence and the court instructed as a matter of law that said defendant was liable for Welo's negligence because he was its agent or employee. Though this instruction was technically erroneous, it certainly could not work any prejudice for the conflict in the evidence was hardly substantial.

 Respondent advances certain contentions to the effect that appellant is precluded by the terms of the pre-trial order and other matters from arguing this question of agency, but the conclusion just expressed renders discussion of those claims unnecessary. See, however, as to voluntary canvassing of issues not mentioned in the pretrial order, *Garrett* v. *William A. Cochrane Co.,* 189 Cal.App.2d 566, 574 [11 Cal. Rptr. 345].

Appellants urge that they were released from liability by an instrument reading as follows: "Release Agreement. Pursuant to our telephone conversation, this written agreement hereby releases the Wayne Steffner Productions and any or all of its agents or representatives from any and all responsibility, liability or claims resulting from the performance of my act. /s/ Alphonse Woodall, Human Kite." Without any previous discussion, this document was presented to plaintiff upon his arrival at defendant's office, he was requested to sign, he read it and signed it; there was no further talk about it. The deal was oral, completed by telephone, nothing had been said on this subject, and plaintiff relying upon the deal as made had paid or incurred transportation costs of $224. Without any additional consideration he signed this instrument after arriving in California.

There is in it no mention of negligence and the writing must be strictly construed, with the result that it does not cover defendant's own negligence. (See *Basin Oil Co.* v. *Baash-Ross Tool Co.*, 125 Cal.App.2d 578, 595 [271 P.2d 122]; 35 Cal.Jur.2d § 6, p. 490.)

The trial judge inquired whether the document was offered as a *retraxit* or release of liability, and defense counsel said: "It is offered not only for that purpose but also for the purpose of showing the knowledge of the plaintiff with respect to the act. It is not offered as a release subsequent but it is offered for the effect of this statement as a release prior to the act." Actually, the document is not a retraxit or a release but an agreement for exemption from liability. However, we see no difference in the basic rules governing the interpretation of any and all of such documents with respect to liability for one's own negligence. We think the same true of indemnity agreements.

Appellants rely upon *Harvey Machine Co.* v. *Hatzel & Buehler, Inc.*, 54 Cal.2d 445 [353 P.2d 924], while respondent pins his faith to *Vinnell Co.* v. *Pacific Elec. Ry. Co.*, 52 Cal.2d 411 [340 P.2d 604]. In *Vinnell* it is said, at page 414: "It would appear that 'to be sufficient as an exculpatory provision against one's own negligence, the party seeking to rely thereon must select words or terms clearly and explicitly expressing that this was the intent of the parties.' (*Sproul* v. *Cuddy*, 131 Cal.App.2d 85, 95 [280 P.2d 158].) The language of the present clause, prepared on behalf of the defendant railroad, falls short of so expressing the defendant's

intention to exculpate itself. As stated in *Basin Oil Co.* v. *Baash-Ross Tool Co.,* 125 Cal.App.2d 578, 595 [271 P.2d 122], quoting from *Pacific Indemnity Co.* v. *California Elec. Works, Ltd.,* 29 Cal.App.2d 260, 274 [84 P.2d 313], 'The defendant itself wrote the provision into the contract for its own benefit. It could have plainly stated, if such was the understanding of the parties, that the plaintiff agreed to relieve it in the matter from all liability for its own negligence. As it did not do so, we resolve all doubt, as we should, in favor of the plaintiff, and hold that it was not the intent of the parties to give to the contract as written the effect claimed by the company.' '' At page 416: ''Both by precedent and good reason, if an indemnitor such as the plaintiff is to be made responsible for the negligent acts of an indemnitee over whose conduct it has no control, the language imposing such liability should do so expressly and unequivocally so that the contracting party is advised in definite terms of the liability to which it is exposed. The indemnification clause in the present case, by not expressly stating that the defendant was protected against acts of its own negligence, failed to meet this requirement.''

The *Harvey Machine Co.* case, *supra,* held an indemnification clause of a contract to be sufficient protection against the indemnitee's own negligence, though that word was not used in it. The court said, at page 447: ''The question is one of interpretation of contracts. If it can be determined that the parties intended by their agreement to protect the indemnitee against claims of damage caused by any or even all types of negligent conduct on its part, such an agreement would effectively accomplish that purpose.'' It then distinguished the *Vinnell* case, *supra,* as follows: ''In the *Vinnell* case it was held that the agreement therein could not be construed to provide that the parties intended to protect the indemnitee against its affirmative acts of negligence, where such protection was not expressly provided. . . . Significant factual differences exist in the present case. Here the indemnitee did not continue to maintain independent operations on the premises whereon construction was in progress. The injuries did not result from some conduct or omission unrelated to the indemnitors' performance. Most significantly of all, the claimed breach of duty on the indemnitee's part was not active, affirmative misconduct, but at most passive negligence—a failure to act in fulfillment of a duty of care which devolved upon

the indemnitee as the owner or occupier of land. Finally, the misconduct does not relate to some matter over which the indemnitee exercised exclusive control." (P. 448.) "In view of the distinctions hereinbefore drawn, the present decision is not inconsistent with the views expressed in the opinion in the *Vinnell* case, *supra*. As noted particularly, the conduct there involved an affirmative, unrelated act of negligence on the part of the indemnitee. It was stated therein, and the decision turned on the holding, that 'courts have consistently adopted the position that indemnification claims are to be strictly construed against the indemnitee in cases involving affirmative acts of negligence on his part. (Citations.)'" (P. 449.)

*Barkett* v. *Brucato*, 122 Cal.App.2d 264 [264 P.2d 978], cited in *Vinnell, supra,* develops the point clearly. Speaking through Mr. Presiding Justice Peters, the court said at page 278: "There is a marked tendency in the more recent cases involving the landlord and tenant relationship to hold that by such clauses the parties could not have intended to provide that the landlord should not be liable for acts amounting to active and affirmative negligence, and to'limit such clauses to injuries caused by defects resulting from wear or tear, inherent defects, the elements, and not actively aggravated by the landlord, or to injuries caused by other tenants. In other words, these cases hold, based on the presumed intent of the parties, that such general clauses were never intended to immunize the landlord from responsibility for his acts of affirmative negligence. . . . California has definitely aligned itself with this school of thought. The leading case is *Butt* v. *Bertola*, 110 Cal.App.2d 128 [242 P.2d 32]. In that case it was specifically held that the rule of the *Werner* v. *Knoll* [89 Cal.App.2d 474 (201 P.2d 45)] and *Inglis* v. *Garland* [19 Cal. App.2d Supp. 767 (64 P.2d 501)] cases, *supra,* did not apply to acts amounting to affirmative negligence. The rationale of the opinion is that a general waiver clause, independently of [Civil Code] section 1668, will not be interpreted, in the absence of clear, positive and specific language, to include acts amounting to affirmative negligence."

As the claim at bar is exemption from liability for defendants' own affirmative negligence, the *Vinnell, Barkett* and *Basin Oil Company* cases, *supra,* are controlling.

■ Upon another basis this must be so. Plaintiff had been promised an expert driver who would understand and follow instructions and signals; the driver Welo, selected and desig-

nated for that purpose, had agreed to do so. The language of *Continental Mfg. Corp.* v. *Underwriters at Lloyds London,* 185 Cal.App.2d 545, 550 [8 Cal.Rptr. 276], is pertinent: "Provisions of a contract of the character we have before us for consideration here will not be interpreted as expressing the intention of the parties that one shall be released from responsibility for the violation of a duty which by the same contract he has expressly undertaken."

The trial judge admitted the instrument into evidence "for the limited purpose of showing, if the jury finds it does, the element of knowledge. It is not admitted for the purpose of any release of legal liability of the defendant, if there is any, for that limited purpose." He instructed the jury accordingly. There was no error in this ruling or in the instruction based on it.

 Appellants assert that plaintiff was negligent as a matter of law in attempting such an inherently hazardous stunt and complain of refusal of certain requested instructions along that line. We think that, at best, it was a question of fact. The court submitted it to the jury as such. 35 California Jurisprudence 2d section 225, page 757: "Taking a risk does not amount to contributory negligence unless it is not necessary in order to meet the ordinary requirements of business or pleasure. It constitutes contributory negligence only if it would not have been taken by an ordinarily prudent person in the given situation. A previous assurance of safety, given to the person charged with contributory negligence may have a bearing on the determination whether he acted reasonably in not paying attention to the possibility of the danger involved."

Plaintiff, engaged in the business of television servicing and hi-fi installation, had served as airplane mechanic in the Army Air Force and had studied the basic principles of flight at Sheppard Field, Texas, one of the finest schools in the country. Kite-flying with water skis is a common sport throughout the eastern part of the country, especially in Florida. Plaintiff became interested in the sport when he saw an exhibition of same in Cleveland. This led to the construction of his own kite and the flying of same over water some 225 to 250 times, including a flight across Lake Erie, some 32 miles. At none of these times did he suffer any injury, though he had one or two spills when flying over water. One he related as follows: "Once I had a cruiser went across our wake. We were in a small boat and the bow ran in the wake and it had no choice

but stop the forward motion and the kite would stop her forward flight in the center balance point and come straight down like a parachute, and you adjusted your skis and slid into the water." He turned from water to flights over land, which he found smoother and steadier than water. After 10 or 11 trial flights he gave one exhibition over land at Cleveland in October or November, 1958. He understood this to be the first time in history such a flight had been made over dry land, and it was a success. The only danger point lay in possible lack of cooperation on the part of the driver of the tow car. Plaintiff went over the matter about 30 times with Welo who understood the instructions and agreed to conform to them and to the signals given to him. To plaintiff he appeared to be a careful driver, alert and understanding. The assurances given to plaintiff by his employer's officers placed Welo in the class of an expert stunt driver. Every phase of this flight had been canvassed by plaintiff in advance and with utmost care. The evidence discloses that he had so perfected the flight that he could successfully control all elements of danger except that flowing from failure of the driver of the automobile to cooperate according to an agreed plan of action. Plaintiff was not required to anticipate negligence on the part of defendant or its driver — had a right to assume, until alerted to the contrary, that they would exercise ordinary care (35 Cal.Jur.2d § 232, p. 765). The accident was caused by excessive speed of the car driven by Welo, negligently so, and there seems to be no basis for holding that plaintiff was negligent in any respect. Colonel Glenn's flight around the world in outer space certainly was a highly hazardous one but was so carefully planned and executed that, though it might fall within the classification of assumption of risk, it certainly could not be classified as negligence. In lesser degree the same holds true of plaintiff's flight.

The issue of assumption of risk, upon which appellants heavily rely, was left to the jury as one of fact by the instructions, which were as favorable to defendants as they reasonably could expect.

It is doubtless true that plaintiff assumed any risk growing out of inexpert manipulation of the kite, a sudden windstorm, breaking loose of the tow rope which he had fastened, the kite splitting in the air, or any one of many eventualities that were not properly attributable to the two defendants' own activities. Respondent's brief says, at page 63: "Respondent may have assumed the risk of his kite's breaking, his landing's

being imperfect, a pothole in the road, a gust of wind. But that respondent assumed the risk of the ridiculous and callous lead-foot on the accelerator, which *in fact* caused the accident, is denied by a mass of testimony. Every case cited by appellants simply underlines this concept. In each and every one of them, the cause of the injury was inherent in the very nature of the thing.''

Concerning defendant's part in the flight, it is to be remembered that plaintiff had been assured repeatedly as to the competency and care of the driver to be furnished by defendant. That was the one feature of the venture that he could not control. He obviously surrendered his judgment as to selection of a driver to defendant and did so upon the faith of such assurances given him. ▆▆▆ Prosser on Law of Torts, 2d edition, page 311, says: ''Assumption of risk must be free and voluntary. If it clearly appears from the plaintiff's words or conduct that he does not consent to relieve the defendant of the obligation to protect him, the risk will not be assumed. . . . ▆▆▆ If, however, he surrenders his better judgment upon an assurance of safety or a promise of protection, he does not assume the risk, unless the danger is so obvious and so extreme that there can be no reasonable reliance upon the assurance.'' 65 Corpus Juris Secundum section 174, page 851: ''Thus, if plaintiff surrendered his better judgment on an assurance of safety or a promise of protection he did not assume the risk unless the danger was so obvious and so extreme that there could be no reasonable reliance on the assurance.'' See also *Fred Harvey Corp.* v. *Mateas* (9 Cir.), 170 F.2d 612, 615-616; *Whyte* v. *Idora Park Co.,* 29 Cal.App. 342, 343, 346 [155 P. 1018]; *Weis* v. *Davis,* 28 Cal.App.2d 240, 244 [82 P.2d 487].

65 Corpus Juris Secundum section 174, page 852, further says: ''[O]ne is not required to anticipate that he will be exposed to a hazard not naturally incidental to his situation, but arising from negligence which he has no reason to foresee.'' *Rogers* v. *Los Angeles Transit Lines,* 45 Cal.2d 414, 419 [289 P.2d 226]: ''While a person, if fully informed, may assume the risk even though the dangerous condition is caused by the negligence of others (*Prescott* v. *Ralphs Grocery Co., supra,* 42 Cal.2d 158, 162 [265 P.2d 904]) 'The plaintiff does not assume the risk of any negligence which he has no reason to anticipate, but once he is fully informed of it, it is well settled that the risks arising from such negligence may be

assumed.' (Prosser on Torts, p. 385.)'' See also 35 California Jurisprudence 2d section 278, page 824.

The parties had a fair trial and the judgment is affirmed; the attempted appeal from the verdict of the jury is dismissed; the order denying motion of defendants Wayne Steffner Productions, Inc., and Jerome Welo for judgment notwithstanding the verdict is affirmed.

Fox, P. J., and Herndon, J., concurred.

The petition of defendants and appellants for a hearing by the Supreme Court was denied May 23, 1962.